730 F.2d 842
 15 Fed. R. Evid. Serv. 222
 Tierney A. O'ROURKE, Public Administrator of Queens County,
New York, as Administrator of the Estate of
Alexandros Hadzis, deceased,
Plaintiff-Appellee- Cross-Appellant,
v.
EASTERN AIR LINES, INC., Defendant-Cross-Appellee,
and
United States of America, Defendant-Appellant-Cross-Appellee.
 Nos. 56, 182, Dockets 83-6065, 83-6071.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 7, 1983.
Decided March 2, 1984.
 
 Milton G. Sincoff, New York City (Steven R. Pounian, Kreindler & Kreindler, New York City, Chauncey E. Wilowski, Jamaica, N.Y., on brief), for plaintiff-appellee-cross-appellant.
 Alan D. Reitzfeld, New York City (Walter E. Rutherford, Haight, Gardner, Poor & Havens, New York City, on brief), for defendant-cross-appellee.
 Thomas B. Roberts, Asst. U.S. Atty., Brooklyn, N.Y. (Raymond J. Dearie, U.S. Atty., E.D.N.Y., Miles M. Tepper and Cyril Hyman, Asst. U.S. Attys., Brooklyn, N.Y., on brief), for defendant-appellant-cross-appellee.
 Before MANSFIELD and PRATT, Circuit Judges, and TENNEY, Senior District Judge.*
 TENNEY, District Judge.
 Defendant, United States of America ("the United States"), appeals from a final judgment of the United States District Court for the Eastern District of New York, Henry Bramwell, District Judge, awarding plaintiff $982,100 in damages for the wrongful death of plaintiff's decedent. The United States contends that the award was excessive as a matter of law and, in addition, that the district court erred when it permitted the plaintiff to increase the ad damnum clause in the amended complaint to an amount in excess of the administrative claim filed pursuant to 28 U.S.C. Sec. 2675 (1976).
 On cross-appeal, plaintiff, Tierney A. O'Rourke, the Public Administrator of Queens County, New York ("the Public Administrator") challenges (1) the application of New York law instead of Greek law to the question of damages, (2) the court's refusal to award prejudgment interest on a sum due from Eastern Air Lines, Inc. ("Eastern") under the absolute liability provision of the Warsaw Convention, (3) the exclusion of circumstantial evidence on the decedent's conscious pain and suffering, and (4) the exclusion of certain testimony on the issue of lost future earnings.
 For the reasons stated below, we affirm the rulings contested by plaintiff on cross-appeal, but reverse on the issues raised by the government concerning the award of damages. The district court erred in allowing the plaintiff to amend the ad damnum clause. Furthermore, the award of damages is excessive, and, accordingly, the district court is instructed to retry the issue of damages unless the plaintiff is willing to remit 21% of the award.
 BACKGROUND
 On June 24, 1975 Eastern Air Lines Flight 66 en route from New Orleans to New York City crashed on its approach to John F. Kennedy International Airport ("JFK"). Among those killed in the crash was Alexandros Hadzis ("Hadzis"), a Greek citizen and seaman who was on his way home to Greece. The Public Administrator brought an action against Eastern and the United States on behalf of Hadzis' estate initially seeking $925,000 in damages for his wrongful death and conscious pain and suffering. The claim against the United States, brought pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. Secs. 2671-80 (1976),[1] alleged that the air traffic controllers at JFK had been negligent. In addition, because Hadzis was engaged in international transportation at the time of the crash[2] and, thus, subject to the terms and conditions of the Warsaw Convention ("the Convention"),[3] as supplemented by the Montreal Agreement ("the Agreement"),[4] plaintiff brought a separate claim for $75,000 against Eastern under the absolute liability provision of the Convention. All of the actions arising out of the crash were transferred to the Eastern District of New York and were consolidated for pretrial purposes. See In re Air Crash Disaster at John F. Kennedy Int'l Airport on June 24, 1975, 407 F.Supp. 244 (J.P.M.D.L.1976). After the completion of pretrial discovery, the court consolidated the passenger actions for a trial on the issue of liability. On the eve of trial, the United States consented to a liability judgment. Subsequently, a jury found Eastern negligent. This was affirmed on appeal. 635 F.2d 67 (2d Cir.1980). Following the affirmance, Eastern moved pursuant to the damage limitation provision of the Warsaw Convention for partial summary judgment to limit its liability to the Hadzis estate to $75,000. The court granted the motion, O'Rourke v. Eastern Air Lines, 16 Avi.L.Rep. 18,367 (E.D.N.Y. Jan. 29, 1982), and on March 1, 1982, after depositing $75,000 with the Clerk of the Court, Eastern withdrew from the proceedings.
 Plaintiff had previously made two motions. One sought a ruling that the damage law of Greece applied to the action on behalf of the Hadzis estate. The other sought permission to amend the complaint in that action to increase the ad damnum clause from $925,000 to $1,400,000. The district court ruled that New York law rather than Greek law applied and, with the other motion still pending, commenced a non-jury trial on the issue of damages.
 On June 21, 1982, the lower court entered two orders. In one, the court granted plaintiff's motion to increase the ad damnum clause. In the other, which included the court's findings of fact and conclusions of law, the court awarded the plaintiff $982,100 for the wrongful death of Hadzis. The court made no award for his conscious pain and suffering apparently because no evidence had been admitted at the trial to substantiate this claim. During the course of the trial, the court ruled that the proffered testimony of Mary Mooney ("Mooney"), an Eastern flight attendant who survived the crash, was not relevant on the question of Hadzis' pain and suffering and was therefore inadmissible.
 The district court also found that the $982,100 award did not have to be discounted. While it recognized the usual requirement that awards be discounted to present value, see generally Jones & Laughlin Steel Corp. v. Pfeifer, --- U.S. ----, 103 S.Ct. 2541, 2550, 76 L.Ed.2d 768 (1983) ("[E]ven in an inflation-free economy the award of damages to replace the lost stream of income cannot be computed simply by totaling up the sum of the periodic payments. For the damages award is paid in a lump sum at the conclusion of the litigation, and when it--or even a part of it--is invested, it will earn additional money.... '[T]he ascertained future benefits ought to be discounted in the making up of the award.' ") (quoting Chesapeake & Ohio R. Co. v. Kelly, 241 U.S. 485, 490, 36 S.Ct. 630, 632, 60 L.Ed. 1117 (1916)) (footnote omitted), the lower court found, based on the testimony of plaintiff's expert, that the "total offset" approach should be applied. Under this approach an award for lost future earnings is adjusted neither upward nor downward since the potential benefit from investing the money is counterbalanced by inflationary forces. See Pfeifer, supra, 103 S.Ct. at 2554. In a related evidentiary ruling the court held that the plaintiff's expert could not testify about the propriety of adjusting the lost future earnings figure upward because his proposed testimony came as a surprise to the government.
 Finally, in a post-trial motion, the plaintiff moved for an order directing Eastern to pay prejudgment interest on the $75,000. Finding that the damage limitation provisions of the Convention and Agreement were inclusive of prejudgment interest, the lower court denied the motion. O'Rourke v. Eastern Air Lines, Inc., 553 F.Supp. 226 (E.D.N.Y.1982).
 Since we do not agree with the plaintiff-cross-appellant that the district court erred in its rulings on the prejudgment interest, the admissibility of testimony, or the choice-of-law question, we affirm on those issues. We do believe, however, that the court erred in allowing the plaintiff to amend the ad damnum clause and that the final damage award is excessive. Thus, a retrial of the damage issue is required unless the plaintiff agrees to a remittitur as set out below.
 Because a determination of the appropriate substantive law to be applied in this case is necessary before we may consider in particular the prejudgment interest issue, and the award of damages, we will address the questions raised on cross-appeal first.
 DISCUSSION
 A. The Cross-Appeal
 1. Choice-of-law
 The Public Administrator argues that Judge Bramwell erred in applying New York's wrongful death law. Although New York's choice-of-law rules are far from clear, we do not believe that a New York court would agree with the plaintiff and apply the law of Greece in this case where the tortious conduct occurred in the state and New York is the forum state.
 Under the FTCA a district court must apply the whole law of the state in which the acts of negligence occurred, including the choice-of-law rules of that state. Richards v. United States, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). Where jurisdiction rests upon diversity of citizenship, the court must apply the whole law of the state in which it sits. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85, L.Ed. 1477 (1941); Rosenthal v. Warren, 475 F.2d 438 (2d Cir.), cert. denied, 414 U.S. 856, 94 S.Ct. 159, 38 L.Ed.2d 106 (1973).[5]
 Following these guidelines, the district court held that under New York's choice-of-law rules a New York court would apply its own substantive law concerning wrongful death because it was either the place of the wrong or the place with the greater governmental interest. New York's Wrongful Death Statute, unlike that of Greece, does not provide for recovery in wrongful death actions for loss of consortium, Liff v. Schildkrout, 49 N.Y.2d 622, 404 N.E.2d 1288, 427 N.Y.S.2d 746 (1980), or for the survivor's grief. Horton v. State, 50 Misc.2d 1017, 272 N.Y.S.2d 312 (Ct.Cl.1966). See also Garland v. Herrin, 724 F.2d 16, at 20 (2d Cir.1983).
 Our task is to determine what law New York courts would apply in this situation rather than a " 'rule we [might] think better or wiser.' " See id., at 17 (quoting Hausman v. Buckley, 299 F.2d 696, 704-05 (2d Cir.), cert. denied, 369 U.S. 885, 82 S.Ct. 1157, 8 L.Ed.2d 286 (1962)); O'Connor v. Lee-Hy Paving Corp., 579 F.2d 194, 205 (2d Cir.), cert. denied, 439 U.S. 1034, 99 S.Ct. 638, 58 L.Ed.2d 696 (1978). Furthermore, we have noted that "the district judge's interpretation of ... choice-of-law precedent is entitled to special deference because of his experience and familiarity with [the] law." Saloomey v. Jeppesen & Co., 707 F.2d 671, 676 (2d Cir.1983) (citing Bernhardt v. Polygraphic Co. of Am., 350 U.S. 198, 204, 76 S.Ct. 273, 276, 100 L.Ed. 199 (1956)). This principle is especially persuasive when this court is called upon to wade into New York's choice-of-law quagmire.
 The New York Court of Appeals was one of the first courts to reject the rigid lex loci delicti (place of the wrong) rule in favor of a more flexible modern approach to tort choice-of-law questions.[6] In the landmark case of Babcock v. Jackson, 12 N.Y.2d 473, 191 N.E.2d 279, 240 N.Y.S.2d 743 (1963), the court held that an Ontario guest statute would not be applied to bar recovery in an action by a New York guest against a New York automobile driver-host, even though the accident occurred in Ontario. The court stated that:
 Justice, fairness and "the best practical result" ... may best be achieved by giving controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties has the greatest concern with the specific issue raised in the litigation.
 12 N.Y.2d at 482, 191 N.E.2d at 283, 240 N.Y.S.2d at 749 (citation omitted).
 However, over the next nine years, as a number of conflict-of-law cases involving wrongful death and guest statutes reached the court, the analytical methodology on which the court relied in selecting the appropriate law appeared to change. See, e.g., Dym v. Gordon, 16 N.Y.2d 120, 209 N.E.2d 792, 262 N.Y.S.2d 463 (1965) (applicable law determined by the location of most significant relationship between the parties); Macey v. Rozbicki, 18 N.Y.2d 289, 221 N.E.2d 380, 274 N.Y.S.2d 591 (1966) (applicable law determined by a counting of the contacts with the interested states); Tooker v. Lopez, 24 N.Y.2d 569, 249 N.E.2d 394, 301 N.Y.S.2d 519 (1969) (government interest analysis determines choice-of-law question). See generally R. Leflar, American Conflicts Law Sec. 91, at 183-85 (3d ed. 1977); Korn, supra note 6, at 820-902. Thus, the court created an inconsistent body of precedent with seemingly similar cases decided differently.
 Finally, in Neumeier v. Kuehner, 31 N.Y.2d 121, 286 N.E.2d 454, 335 N.Y.S.2d 64 (1972), the court acknowledged this lack of consistency in its previous multistate accident cases. Id. at 127, 286 N.E.2d at 457, 335 N.Y.S.2d at 69. In Neumeier, the question before the court again concerned Ontario's guest statute. The issue was whether the statute was applicable in an action between an injured Ontario domiciliary and his New York host arising out of an accident in Ontario. The court held that the statute did apply and promulgated three principles for the resolution of future guest statute problems in conflict situations.[7] However, the court did not make clear whether these principles applied equally to other multistate tort cases. See Herzog, 1982 Survey of New York Law--Conflicts-of-Laws, 34 Syracuse L.Rev. 113, 140 (1983); Korn, supra note 6, at 884-86.
 After Neumeier, the flow of explicative decisions dealing with tort choice-of-law issues dwindled, and only a few short opinions have been issued by the Court of Appeals. See, e.g., Croft v. National Car Rental, 56 N.Y.2d 989, 439 N.E.2d 346, 453 N.Y.S.2d 631 (1982) (mem.); Cousins v. Instrument Flyers, Inc., 44 N.Y.2d 698, 376 N.E.2d 914, 405 N.Y.S.2d 441 (1978) (per curiam). Unfortunately, these have only added to the confusion. See generally R. Cramton, D. Currie & H. Kay, Conflict of Laws 243 (3d ed. 1981); Korn, supra note 6, at 957.
 In Cousins, the court signaled an apparent retreat from its modern approach. It stated in dictum that "[i]t is true that lex loci delicti remains the general rule in tort cases to be displaced only in extraordinary circumstances. But it has been acknowledged that in airplane crash cases, the place of the wrong, if it can even be ascertained, is most often fortuitous." 44 N.Y.2d at 699, 376 N.E.2d at 915, 405 N.Y.S.2d at 442 (citations omitted).[8] This statement has caused considerable confusion in the lower New York courts.[9] See Korn, supra, at 957. Nevertheless, the Court of Appeals has made no attempt to clarify the "extraordinary circumstances" qualification, nor is it clear from the Cousins opinion that all or even most airplane crash cases are within this exception.
 Notwithstanding these uncertainties, a district court judge faced with a New York choice-of-law question can not throw up his or her hands and walk away from the problem. With the above discussion in mind, we have concluded that Judge Bramwell did not commit reversible error in ruling that a New York court would apply its own substantive law in this case.
 We are not convinced that, as the Public Administrator argues, the lex loci delicti rule in New York applies only to choice-of-law issues involving tortious conduct and not to the issue of damages. The Court of Appeals in Cousins, albeit in dictum, stated that "lex loci delicti remains the general rule in tort cases." (Emphasis added).[10] The court did not indicate that this statement applied only to tortious conduct. Moreover, we do not believe that claims arising out of an airplane crash require the application of the Cousins "extraordinary circumstances" exception simply because of the transitory nature of the tort. See Grancaris v. J.I. Hass Co., supra, 79 A.D.2d at 551, 434 N.Y.S.2d at 21 ("Tort cases, though transitory, still remain subject, in choice-of-law matters, to the rule of lex loci delicti ....") Finally, the additional compensation the decedent's beneficiaries would receive if Greek law were applied hardly seems to be an extraordinary circumstance that would satisfy the Cousins exception. See Rakaric v. Croatian Cultural Club, supra.
 Even if a New York court applied interest analysis in the instant case, we do not believe that it would agree with plaintiff that the law of the decedent's beneficiaries' domicile should always be applied in aviation wrongful death cases because that jurisdiction has the superior interest.[11] This court has observed that " 'a domiciliary conceptualism that rest[s] on a vested right accruing from the fact of domicile' [should not be substituted] for New York's sophisticated 'interest analysis' approach to choice of law problems. The New York precedents require more." Rosenthal, supra, 475 F.2d at 444 (quoting Miller v. Miller, 22 N.Y.2d 12, 29, 237 N.E.2d 877, 887, 290 N.Y.S.2d 734, 748 (Breitel, J., dissenting)). See also Tooker, supra, 24 N.Y.2d at 580-81, 249 N.E.2d at 401, 301 N.Y.S.2d at 528-29.
 
 
 1
 In applying governmental interest analysis to a choice-of-law problem, a court examines the policies underlying the alleged conflicting laws to determine which state has the greatest interest in the application of its own law. See id. at 576-77, 249 N.E.2d at 398-99, 301 N.Y.S.2d at 525-26. Additional factors that a court considers in this process are "the domiciles of the parties, the place where the tortious conduct occurred and where the injury was suffered." Bing v. Halstead, 495 F.Supp. 517, 520 (S.D.N.Y.1980). The lower court, utilizing this approach, found that New York, as the state where the crash occurred and as the forum state, had a greater interest in the application of its own law.
 
 
 2
 Plaintiff has not persuaded us that the result should be otherwise. This is not a situation where one party seeks the application of an anachronistic law that would drastically limit or eliminate the damage award. See Kilberg v. Northeast Airlines, Inc., 9 N.Y.2d 34, 172 N.E.2d 526, 211 N.Y.S.2d 133 (1961); see also Rosenthal, supra, 475 F.2d at 446. Nor will an unjust or anomalous result occur if New York law is applied. See Babcock, supra. Both Greece and New York in their wrongful death statutes provide full and adequate compensation for the beneficiaries of decedents. New York, however, has a strong public policy to " 'specifically [limit] recovery in wrongful death actions to pecuniary damages resulting from decedent's death.' " Garland, supra, at 20 (quoting Campbell v. Westmoreland Farm, Inc., 403 F.2d 939, 940 n. 1 (2d Cir.1968)). In addition, New York, in order to discourage forum shopping and encourage business within the state, has a governmental interest in assuring that defendants will not be subject to damage awards larger than those provided for by state law.[12] Greece also has a governmental interest in this action. It has an interest in assuring that its domiciliaries receive compensation for loss of consortium and the survivor's grief. While the policy considerations underlying the Greek laws are not clear from the record, Greece's interest in the application of its own law is not compelling since under New York law the beneficiaries will receive sufficient compensation to avoid becoming a burden to society. Accordingly, plaintiff has not demonstrated that Greece has enough of an interest in the application of its law to displace New York's interests in the application of its own law.[13] New York is the forum; the tortious conduct occurred in the state; and the defendants have substantial contacts with the state. See Cousins, supra; Tooker, supra; see also Walkes v. Walkes, 465 F.Supp. 638 (S.D.N.Y.1979).
 
 
 3
 Thus, under either a government interest analysis approach or the rule of lex loci delicti, the law of New York should be applied to this case. Having determined this, we need not consider the government's alternate argument that under the FTCA a claim may not be brought against the United States if it is based on a foreign law. Nor is it necessary for us to decide whether a New York court would accept the public policy considerations relied on by the court in In re Paris Air Crash of March 3, 1974, 399 F.Supp. 732 (C.D.Cal.1975), to apply the law of the forum.
 
 
 4
 2. Prejudgment Interest on the Warsaw Convention Damage Award
 
 
 5
 The Public Administrator asserts that the district court erred in holding that the plaintiff could not recover prejudgment interest pursuant to New York law[14] on the $75,000 damage award that it received from Eastern. We disagree.
 
 
 6
 Article 22 of the Warsaw Convention[15] provides in pertinent part that:
 
 
 7
 (1) In the transportation of passengers the liability of the carrier for each passenger shall be limited to the sum of 125,000 francs [about $8,300 in 1934]. Where, in accordance with the law of the court to which the case is submitted, damages may be awarded in the form of periodical payments, the equivalent capital value of the said payments shall not exceed 125,000 francs [about $8,300 in 1934]. Nevertheless, by special contract, the carrier and the passenger may agree to a higher limit of liability.[16]
 
 
 8
 See supra note 3.
 
 
 9
 In 1965, the United States, dissatisfied with the inadequate liability limits afforded its citizens under Article 22, filed a formal notification of denunciation of the Convention to be effective May 15, 1966. Fearful that the world's largest air power would withdraw from the Convention, the majority of airlines signed what has become known as the Montreal Agreement. See Reed v. Wiser, 555 F.2d 1079, 1087 (2d Cir.), cert. denied, 434 U.S. 922, 98 S.Ct. 399, 54 L.Ed.2d 279 (1977); Day v. Trans World Airlines, Inc., 528 F.2d 31, 36 (2d Cir.1975), cert. denied, 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976); see generally Lowenfeld & Mendelsohn, supra note 15, at 563-596. Under the agreement the airlines agreed to be subject to absolute liability unless the passenger himself was at fault,[17] see Day v. Trans World Airlines, Inc., supra, 528 F.2d at 36. Furthermore, paragraph 1(1) of the Agreement states that:
 
 
 10
 The limit of liability for each passenger for death, wounding, or other bodily injury shall be the sum of US $75,000 inclusive of legal fees and costs, except that, in case of a claim brought in a State where provision is made for separate award of legal fees and costs, the limit shall be the sum of US $58,000 exclusive of legal fees and costs.
 
 
 11
 See supra note 4.
 
 
 12
 The Public Administrator argues that since paragraph 1(1) of the Montreal Agreement specifically states that the "$75,000 [is] inclusive of legal fees and costs" but makes no reference to the payment of prejudgment interest,[18] the absence of express language addressing prejudgment interest should be construed to mean that the figure is exclusive of prejudgment interest. According to the Administrator, his interpretation would advance one of the main purposes of both the Convention and the Agreement, namely, the speedy resolution of claims.
 
 
 13
 We are not convinced that the payment of prejudgment interest would necessarily have any impact on the speed with which claims under the Convention are resolved. See 1 L. Kreindler, supra, at Sec. 12 A.08. Further, we are not satisfied that this is one of the main purposes of these agreements. In Reed v. Wiser,[19] supra, a previous case in which this court examined the underlying purposes of the Warsaw Convention, we stated that:
 
 
 14
 It is beyond dispute that the purpose of the liability limitation prescribed by Article 22 was to fix at a definite level the cost to airlines of damages sustained by their passengers and of insurance to cover such damages....
 
 
 15
 ....
 
 
 16
 ... [A]t no time has this country ever abandoned the basic principle that, whatever the limits may be, air carriers should be protected from having to pay out more than a fixed and definite sum for passenger injuries sustained in international air disasters.
 
 
 17
 Id. at 1089 (emphasis in original) (footnotes omitted). We also noted that:
 
 
 18
 Another fundamental purpose of the signatories to the Warsaw Convention, which is entitled to great weight in interpreting that pact, was their desire to establish a uniform body of world-wide liability rules to govern international aviation, which would supersede with respect to international flights the scores of differing domestic laws, leaving the latter applicable only to the internal flights of each of the countries involved.
 
 
 19
 Id. at 1090 (footnotes omitted).
 
 
 20
 There is no indication that the contracting parties to the Montreal Agreement intended to modify these principles so that they would be liable for more than the fixed and definite sum of $75,000. See id. at 1089. See generally 1 L. Kreindler, supra, at Sec. 12 A.02-.06; Sheinfeld, From Warsaw to Tenerife: A Chronological Analysis of the Liability Limitations Imposed Pursuant to the Warsaw Convention, 5 J. of Air L. & Com. 653, 665-71 (1980). Although the $75,000 limitation may be anachronistic, the awarding of prejudgment interest in excess of this amount would be contrary to the purposes of the two agreements and would thus undercut the fundamental intent of their framers.
 
 
 21
 Nor can any support be found for the Public Administrator's position in the language of either document. We have noted that the specific words of a treaty should be given " 'a meaning consistent with the genuine shared expectations of the contracting parties.' " Reed, supra, 555 F.2d at 1090 (quoting Day v. Trans World Airlines, Inc., supra, 528 F.2d at 35). The fact that the $75,000 figure in the Agreement is inclusive of attorney's fees cannot be read to mean that it excludes prejudgment interest. Paragraph 1(1) of the Agreement also provides for an award of $58,000 exclusive of attorney's fees in States "where provision is made for separate award of legal fees and costs." In light of the damage limitation principle established in Article 22 of the Convention, see id. at 1089, it would appear that, if the signatories to the Agreement had intended to create any exclusions to the damage limitation figures, they would have included a specific provision in the agreement similar to the one concerning the separate award of legal fees and costs. See Block v. Compagnie Nationale Air France, 386 F.2d 323, 329 (5th Cir.1967), cert. denied, 392 U.S. 905, 88 S.Ct. 2053, 20 L.Ed.2d 1363 (1968). Cf. Lowenfeld & Mendelsohn, supra note 15, at 563, 568.
 
 
 22
 Furthermore, the Montreal Agreement must be read in the context of the Warsaw Convention. See id. at 597. The Convention indicates that any liabilities that the airlines may be subject to must be found within that document. Article 24 states that:
 
 
 23
 (1) In the cases covered by articles 18 and 19 any action for damages, however founded, can only be brought subject to the conditions and limits set out in this convention.
 
 
 24
 (2) In the cases covered by article 17 the provisions of the preceding paragraph shall also apply ....
 
 
 25
 See supra note 3 (emphasis added). In the five instances where the law of the forum is applicable, the articles so state explicitly. Reed, supra, 555 F.2d at 1092 (citing Sundberg, Air Charter: A Study in Legal Development 242 (Stockholm 1961)). An award of prejudgment interest pursuant to the law of the forum is not a condition set out in the Convention. See Husserl v. Swiss Air Transport Co., 388 F.Supp. 1238, 1246 (S.D.N.Y.1975).
 
 
 26
 As a treaty adhered to by the United States, the Warsaw Convention is the supreme law of the land, see Reed, supra, 555 F.2d at 1093; Smith v. Canadian Pac. Airways, Ltd., 452 F.2d 798, 801 (2d Cir.1971), and our duty is to enforce its provisions according to the intent of the framers. In the absence of any contrary intent on the part of the framers, we may not read into that document a provision that allows the payment of prejudgment interest above the $75,000 liability limitation.[20]
 
 3. The Evidentiary Rulings
 
 27
 The Public Administrator contends that the district court made two erroneous evidentiary rulings concerning the admissibility of testimony during the course of the non-jury trial. First, the Administrator argues that the lower court should have admitted the testimony of Mary Mooney, one of the survivors of the crash, on the issue of the decedent's pain and suffering during the moments between the time when the wing of the descending airplane first struck the ground and the time of final impact. It was established in an offer of proof that Mooney, who was sitting about ten to fifteen feet behind Hadzis at the time of the crash, did not see Hadzis or know what happened to him during this five to ten second period. The Administrator argues, however, that her proffered testimony concerning the conditions within the airplane cabin was not irrelevant, as the court ruled. According to the Administrator, "if admitted, [this testimony would have been] sufficient circumstantial evidence to allow the trial court to draw the reasonable inference that Mr. Hadzis probably suffered consciously ...." Brief of Plaintiff-Appellee-Cross-Appellant at 21 (emphasis added).
 
 
 28
 We do not agree. The question of relevancy is entrusted to the trial judge's discretion, see United States v. Carter, 522 F.2d 666, 685 (D.C.Cir.1975); United States v. Catalano, 491 F.2d 268, 273 (2d Cir.), cert. denied, 419 U.S. 825, 95 S.Ct. 42, 42 L.Ed.2d 48 (1974), and turns in part on the rule of substantive law at issue. See 1 J. Weinstein & M. Berger, Weinstein's Evidence p 401, at 401-48 (1982). Under the law of New York, which governs in this case, see supra note 1, an award of damages for pain and suffering may not be based upon evidence that requires the fact finder to speculate upon the pain and suffering of a decedent prior to death. See Fiederlein v. New York City Health and Hosp. Corp., 56 N.Y.2d 573, 435 N.E.2d 398, 450 N.Y.S.2d 181 (1982); Huertas v. State, 84 A.D.2d 650, 651, 444 N.Y.S.2d 307, 309 (3d Dep't 1981); Anderson v. Rowe, 73 A.D.2d 1030, 1031, 425 N.Y.S.2d 180, 181 (4th Dep't 1980). See also Juiditta v. Bethlehem Steel Corp., 75 A.D.2d 126, 138, 428 N.Y.S.2d 535, 543 (4th Dep't 1980) ("In determining damages for conscious pain and suffering experienced in the interval between injury and death, when the interval is relatively short, the degree of consciousness, severity of pain, apprehension of impending death along with duration are all elements to be considered.") (emphasis added) (citations omitted). Accordingly, since Mooney did not see Hadzis or know what happened to him immediately before the crash, the district court did not abuse its discretion in ruling that her testimony was irrelevant to the question of his conscious pain and suffering.
 
 
 29
 As for the second contested ruling, the plaintiff argues that the district court erred when it ruled that certain proffered testimony of David Bunin ("Bunin"), plaintiff's economic expert, was inadmissible. The offer of proof made to the court demonstrates that Bunin was prepared to testify that a 2% negative growth rate factor should be applied to the award for lost future earnings, and that Hadzis would have been promoted to port captain, thus improving his earning potential.
 
 
 30
 The government argues that a number of adequate evidentiary and procedural grounds support the court's ruling. We agree. "[A] trial judge has broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous." Salem v. United States Lines Co., 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962) (citation omitted); see also Taenzler v. Burlington N., 608 F.2d 796, 798 n. 3 (8th Cir.1979).
 
 
 31
 The record indicates that Bunin's proffered testimony came as a surprise to the government because it was not within the scope of the pretrial order nor produced on discovery and that Judge Bramwell excluded the testimony on these grounds.[21] In addition, the court found the testimony regarding Hadzis' potential promotion to port captain to be speculative and, thus, irrelevant. See Fed.R.Evid. 401; see also Fiederlein v. New York City Health and Hosp. Corp., supra. The plaintiff has not demonstrated that the exclusion of this testimony was manifestly erroneous. Accordingly, the lower court is affirmed on this issue.
 
 B. The Appeal
 1. The Ad Damnum Clause
 
 32
 The district court erred in granting plaintiff's motion to amend the ad damnum clause. As a jurisdictional prerequisite to a suit under the FTCA an administrative claim must be filed with the appropriate federal agency before an action may be commenced against the United States. 28 U.S.C. Sec. 2675(a). See also Adams v. United States, 615 F.2d 284, 286 (5th Cir.1980); Kielwien v. United States, 540 F.2d 676, 679 (4th Cir.), cert. denied, 429 U.S. 979, 97 S.Ct. 491, 50 L.Ed.2d 588 (1976). Section 2675(b) provides further that:
 
 
 33
 Action under this section shall not be instituted for any sum in excess of the amount of the claim presented to the federal agency, except where the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of the claim.
 
 
 34
 (Emphasis added).
 
 
 35
 Shortly before trial plaintiff moved pursuant to Sec. 2675(b) to increase the ad damnum clause from $925,000 to $1,400,000. Plaintiff asserted that, in the six years since it filed the administrative claim, an unprecedented rise had occurred in the salaries paid to Greek captains and mates. Finding that this circumstance constituted an "intervening fact" within the meaning of Sec. 2675(b), the court granted plaintiff's motion.
 
 
 36
 Under the circumstances of this case, however, the motion should not have been granted. While this is our first opportunity to examine Sec. 2675(b), other courts that have ruled on the scope of this section have granted motions to amend ad damnum clauses only when an unexpected change occurred either in the law or in a medical diagnosis. For example, in Husovsky v. United States, 590 F.2d 944, 955 (D.C.Cir.1978), the court held that a changed medical diagnosis predicting an increased life span constituted an "intervening fact" where sufficient evidence supported the inference that the amount of the original claim was based on plaintiff's life expectancy at the time the claim was filed and the increased damage award was sought on the basis of this change. In Funston v. United States, 513 F.Supp. 1000 (M.D.Pa.1981), the district court held that the unpredicted adoption by the state supreme court of a new method of discounting the present value of lost future earnings constituted an intervening fact. The court granted plaintiff's motion to increase the ad damnum clause, "but only to the extent that the increase is applicable to the fact that in submitting the administrative claim Plaintiff discounted his request for lost future earnings as required by then applicable law." Id. at 1007. See also McDonald v. United States, 555 F.Supp. 935, 957-62 (M.D.Pa.1983); Gallimore v. United States, 530 F.Supp. 136 (E.D.Pa.1982).
 
 
 37
 In all of these cases, there was some indication that the amount of the original claim was calculated on the basis of known facts at the time of the filing and that, subsequently, some new and previously unforeseen information came to light. Here, no such showing has been made. Although it is uncontroverted that the salaries of Greek seamen increased dramatically during the intervening six years, plaintiff does not claim that this was unforeseen. More important, he failed to assert sufficient concrete facts demonstrating that he relied on the old salary structure data in the calculation of his original $925,000 claim.
 
 
 38
 The FTCA, as a statute waiving sovereign immunity, must be complied with strictly. See United States v. Kubrick, 444 U.S. 111, 117-18, 100 S.Ct. 352, 356-57, 62 L.Ed.2d 259 (1979). If plaintiff were allowed to amend his ad damnum clause based upon the minimal showing he made in the district court, we would, in effect, be substituting the liberal pleading requirements of Federal Rule of Civil Procedure 15 for the narrower requirements of Sec. 2675(b). This we may not do. See Kubrick, supra. Accordingly, we hold that the district court erred in granting plaintiff's motion to amend the ad damnum clause.
 
 2. Award of Damages
 
 39
 The government contends that the $982,100 damages award to Hadzis' estate is clearly excessive.[22] According to the government this resulted from (1) the use of the total offset method to discount the award to present value, (2) the erroneous calculation of the amount of support that Hadzis would have supplied to his family, and (3) the excessive awards for loss of parental guidance and services.[23] Although we do not agree with all of the government's contentions, we find that the district court made some errors in the calculation of the award, and that a retrial on the issue of damages is required unless the plaintiff is willing to remit 21% of the award.
 
 
 40
 The district court's use of the total offset method was not clearly erroneous or incorrect as a matter of New York law.[24] While we have suggested that a 2% discount rate would be fair to all sides in cases involving federal law, Doca, supra, 634 F.2d at 39, this court has also stated that "we are not prepared to require any one particular method by which inflation should be taken into account in estimating lost future wages," id., and that "[l]itigants are free to account for inflation in other ways, or, if they use the adjusted discount rate approach, to offer evidence of a rate more appropriate than 2%." Id. at 40.
 
 
 41
 The plaintiff's actuarial economist testified that, after studying data on the decedent's earning potential and the Greek economy, it was his conservative opinion that future interest and inflation rates in Greece would be equal and would cancel each other out.[25] These factual findings were adopted by the district court. See Findings 43-45, J.A. at 241-42.
 
 
 42
 The government now contends that the lower court's use of the total offset approach was without an adequate factual basis. The government, relying on language from Stratis v. Eastern Air Lines, Inc., 682 F.2d 406, 415 (2d Cir.1982), argues, in essence, that since plaintiff's economic expert--Bunin--was not an expert on the Greek maritime industry, he was not qualified to testify about future wage increases in that industry. Therefore, the government claims an insufficient factual basis was established for the court's adoption of the total offset method.[26]
 
 
 43
 We do not agree. If the government had wanted the lower court to adopt one of the alternate discount rates that it now urges upon us, it should have had its own experts testify on this matter.[27] The government was well aware before trial of Bunin's qualifications and that he intended to propose that the court adopt the total offset method for discounting the award. See J.A. at 73, 652-53. Nevertheless, the government did not object to Bunin's qualifications to testify on this matter during the trial. More important, the government did not introduce any experts of its own to refute Bunin's contentions; it "contented itself with cross-examination of plaintiff's expert." Vasina v. Grumman Corp., supra, 644 F.2d at 119. It is within the sound discretion of the trial judge to assess the persuasiveness of expert testimony as to estimates and evaluations concerning damages. See Ludlow Corp. v. Textile Rubber & Chem. Co., 636 F.2d 1057, 1060 (5th Cir.1981); Pittman v. Gilmore, 556 F.2d 1259, 1261 (5th Cir.1977). Furthermore, economics is not an exact science allowing an expert to determine the precise value that a lump sum award will have to a decedent's estate over a period spanning forty years. See Pfeifer, supra, 103 S.Ct. 2551-55; Doca, supra, 634 F.2d at 36-39. Accordingly, the district court's adoption of the total offset method to determine the present value of the damage award was not clearly erroneous in light of the evidence submitted.
 
 
 44
 However, the district court's determination of the proportion of the decedent's income that would have gone to the support of his family is more problematic. The district court, relying on the testimony of Bunin, found that Hadzis provided his family with 88% of his earnings. The court reduced this figure to 80% to account for that portion of the money that was saved and later put to his own personal use. See Finding 47, J.A. at 242. At the trial, however, Bunin testified that Hadzis' gross pay for the 12 months preceding his death was approximately $18,500 and that he gave his family approximately $14,500. Id. at 629. He also testified that Hadzis used $2,000 for his own personal expenses and that he was carrying approximately $2,500 when the plane crashed. Id. at 630. The government argues that since $14,500 is 78% of $18,500 rather than 88%, Bunin obviously made a mathematical error in his calculation that the district court repeated in its findings of fact. See Finding 47, J.A. at 242.
 
 
 45
 The government contends that the amounts for past and future support should therefore be reduced by 10%. We agree, and unless the plaintiff is willing to remit 10% of the amounts awarded for support a new damage trial must be conducted.[28]
 
 
 46
 There is no support for the government's additional contention that the district court erred in the calculation of lost support because it excluded $2,000 that Hadzis sent annually to his parents. The district court acknowledged the existence of the gift, see supra, note 22, but found that this amount should not be included in the calculation for lost support on the theory that this amount was cancelled out by $2,000 in bonuses that Hadzis earned each year. Id. The bonuses also were not included in the calculation. Although the government contends that the bonuses were illegal and should not have been considered, the district court found that they were "customary and legitimate [and] could have been expected to continue throughout ... Hadzis' career." Finding 19, J.A. at 238. The government presents no evidence to the contrary, and while an ambiguity appears in the record concerning the calculation of lost support,[29] the ruling that the bonus cancelled out the gift was not clearly erroneous.
 
 
 47
 Both the $75,000 awards for each child for loss of parental guidance and training, Findings 59, 60, J.A. at 244, and the award of $44,000 for loss of services, Finding 61, id., are so excessive as to shock the Court's conscience. See Franchell v. Sims, 73 A.D.2d 1, 6, 424 N.Y.S.2d 959, 962 (4th Dep't 1980). Hadzis was away at sea ten months a year, and he spent one of his two free months on vacation with his wife and child. The amount of time he could have spent on parental guidance or household repairs and services was minimal. The awards are excessive and should be reduced by 50%.
 
 
 48
 In light of the above, we would grant a conditional remittitur to $779,981.[30] If the plaintiff is unwilling to accept this, a new trial on damages is hereby ordered.
 
 
 49
 GEORGE C. PRATT, Circuit Judge, concurring and dissenting:
 
 
 50
 I concur in that part of the majority opinion addressed to the appeal by the United States of America, but dissent from the disposition of plaintiff's cross-appeal because it denies plaintiff prejudgment interest.
 
 
 51
 While the central purpose of the liability limitation established by the Warsaw Convention, as modified by the Montreal Agreement, was "to fix at a definite level the cost to airlines of damages sustained by their passengers and of insurance to cover such damages", Reed v. Wiser, 555 F.2d 1079, 1089 (2d Cir.1977) (emphasis in original), that purpose would be unaffected by requiring Eastern Air Lines to pay interest on the $75,000 award from the time of the accident to the time of judgment. As soon as the accident occurred, Eastern knew exactly what its maximum liability under the Montreal Agreement would be: $75,000 times the number of international passengers on board the ill-fated aircraft.
 
 
 52
 More importantly, as the various lawsuits wore on, Eastern had the use of that money and was able to earn interest on it. By the majority's own calculation, plaintiff's $75,000 recovery here would have earned $31,604.79 in interest even if calculated at New York's unrealistically low legal rates. Stated differently, therefore, "the cost to [Eastern Air Lines]," Reed v. Wiser, 555 F.2d at 1089, of the damages resulting from the death of plaintiff's decedent, Alexandros Hadzis, is not the $75,000 intended by the Montreal Agreement, but no more than $43,395.21, and perhaps significantly less.
 
 
 53
 Since Eastern was clearly and absolutely liable to pay plaintiff the $75,000 from the moment of death, interest on that sum earned during the legal proceedings required to compel its payment should accrue to plaintiff, not Eastern. Airline defendants and their insurers should not have an incentive to use the litigation process in order to reduce costs by delaying payment of moneys clearly due and owing.
 
 
 54
 Absent any language in, or purpose behind, either the Montreal Agreement or the Warsaw Convention that would preclude prejudgment interest, I agree with the view of the Fifth Circuit in Domangue v. Eastern Air Lines, Inc., 722 F.2d 256 (5th Cir.1984), that prejudgment interest should be available to victims of air disasters who recover under the Montreal Agreement.
 
 
 
 *
 Of the Southern District of New York, sitting by designation
 
 
 [1]
 The law of New York governs the substantive issues in this case. 28 U.S.C. Sec. 1346(b) (1976); see infra discussion
 
 
 [2]
 Hadzis' plane ticket provided for him to transfer from Eastern Flight 66 to TWA Flight 880, which flew from JFK to Greece
 
 
 [3]
 Convention for the Unification of Certain Rules Relating to International Transportation by Air, 49 Stat. 3000 (reprinted in 49 U.S.C. Sec. 1502 note, T.S. No. 876, 137 L.N.T.S. 11)
 
 
 [4]
 Agreement Relating to Liability Limitations of the Warsaw Convention and the Hague Protocol, Agreement CAB 18990, approved by order E-23680, May 13, 1966 (Docket 17325), 31 Fed.Reg. 7302 (1966)
 
 
 [5]
 The court's jurisdiction in this case rested on 28 U.S.C. Sec. 1346(b) for the FTCA claim against the government and 28 U.S.C. Sec. 1332 (diversity of citizenship) for the claim against Eastern
 
 
 [6]
 For a comprehensive discussion of New York's choice-of-law rules and precedents see Korn, The Choice-of-Law Revolution: A Critique, 83 Colum.L.Rev. 772 (1983)
 
 
 [7]
 The following three principles were proposed by the Neumeier court:
 
 
 [1]
 When the guest-passenger and the host-driver are domiciled in the same state, and the car is there registered, the law of that state should control and determine the standard of care which the host owes to his guest
 
 
 [2]
 When the driver's conduct occurred in the state of his domicile and that state does not cast him in liability for that conduct, he should not be held liable by reason of the fact that liability would be imposed upon him under the tort law of the state of the victim's domicile. Conversely, when the guest was injured in the state of his own domicile and its law permits recovery, the driver who has come into that state should not--in the absence of special circumstances--be permitted to interpose the law of his state as a defense
 
 
 [3]
 In other situations, when the passenger and the driver are domiciled in different states, the rule is necessarily less categorical. Normally, the applicable rule of decision will be that of the state where the accident occurred but not if it can be shown that displacing that normally applicable rule will advance the relevant substantive law purposes without impairing the smooth working of the multi-state system or producing great uncertainty for litigants
 
 
 [31]
 N.Y.2d at 128, 286 N.E.2d at 457-58, 335 N.Y.S.2d at 70 (citations omitted)
 
 
 [8]
 Cousins was a strict products liability action arising out of a crash in Pennsylvania of a plane rented from a New Jersey corporation by a New York resident. The president of the corporation resided in New York, and the plane had been manufactured in Florida by a Pennsylvania corporation. The parties proceeded to trial on the assumption that New York law applied. Only belatedly did the plaintiff suggest that Pennsylvania law should apply. Under then-applicable New York law, contributory negligence barred recovery; under either New Jersey or Pennsylvania law it did not. The court held that it was not error for the trial judge "to apply New York law, [because it was] not only the law of the forum, but [also] the law applicable to significant events in this multi-State trip by air in the absence of compelling reason to apply belatedly another law, whether on the doctrine of lex loci delicti or otherwise." 44 N.Y.2d at 700, 376 N.E.2d at 914, 405 N.Y.S.2d at 443 (emphasis added)
 
 
 [9]
 The lower state courts have had difficulty with the "extraordinary circumstances" qualifier and uncertainty exists over whether lex loci delicti or "interest analysis" applies. See, e.g., Grancaris v. J.I. Hass Co., 79 A.D.2d 551, 553, 434 N.Y.S.2d 19, 21 (1st Dep't 1980) (the rule of lex loci delicti applies except in rare instances); Rakaric v. Croatian Cultural Club, 76 A.D.2d 619, 627, 430 N.Y.S.2d 829, 835 (2d Dep't 1980) ("extraordinary circumstances" exist where New York has a strong interest in assuring that a resident would not be barred recovery by the doctrine of charitable immunity applicable in the place of the wrong); Himes v. Stalker, 99 Misc.2d 610, 619, 416 N.Y.S.2d 986, 992 (Sup.Ct.1979) ("What the Court of Appeals will determine to be 'extraordinary circumstances' is not clear."); id. at 622, 416 N.Y.S.2d at 993 (" '[L]ex loci delicti' should apply generally to tort conflict problems, other than guest statute situations ....")
 
 
 [10]
 That the New York Court of Appeals never totally rejected the rule of lex loci delicti is apparent from a number of earlier opinions. See, e.g., Neumeier v. Kuehner, supra, 31 N.Y.2d at 131, 286 N.E.2d at 459, 335 N.Y.S.2d at 72 ("What the Babcock case taught and what modern day commentators largely agree is that lex loci delictus is unsoundly applied if it is done indiscriminately and without exception. It is still true, however, that lex loci delictus is the normal rule ....") (Breitel, J., concurring) (citations omitted)
 
 
 [11]
 In support of its argument, plaintiff contends that in aviation wrongful death cases New York courts always apply the law of the decedent's or the beneficiaries' domicile. The Public Administrator cites Junco v. Eastern Air Lines, Inc., 399 F.Supp. 666 (S.D.N.Y.1975), aff'd, 538 F.2d 310 (2d Cir.1976); Gordon v. Eastern Air Lines, Inc., 391 F.Supp. 31 (S.D.N.Y.1975); Thomas v. United Air Lines, Inc., 24 N.Y.2d 714, 249 N.E.2d 755, 301 N.Y.S.2d 973 (1969); and Long v. Pan Am. World Airways, 16 N.Y.2d 337, 213 N.E.2d 796, 266 N.Y.S.2d 513 (1965). All of these were decided before Cousins, and all are factually distinguishable from the instant case. In not one did the aviation disaster occur within the forum state, and, more important, other substantial contacts with the decedent's domicile militated against the application of the law of the place of the wrong
 In addition, as the above discussion of the recent history of New York's conflict-of-law rules indicates, the precedential value of the older cases has been diminished by the evolution of the law. Long, for example, relied on the "most significant relationship" branch of the governmental interest analysis, confirmed by the court in Dym v. Gordon, supra. Dym, however, was later discredited by Tooker, supra, 24 N.Y.2d at 574-76, 249 N.E.2d at 397-98, 301 N.Y.S.2d at 523-25. The Tooker case "looked to the law of the state with the 'superior interest' in having its policy or law applied." Rosenthal, supra, 475 F.2d at 442 (citation omitted). In Long, the court held that Pennsylvania law applied in an action by a Pennsylvania decedent's estate against a New York corporation, arising out of a crash in Maryland. The court found that New York was a disinterested forum. 16 N.Y.2d at 342, 213 N.E.2d at 799, 266 N.Y.S.2d at 517. Whether after Tooker the Court of Appeals would reach the same conclusion is an open question, but it is unlikely that given a similar situation it would summarily conclude that New York as the forum had no interest in the case. See Cousins, supra.
 
 
 [12]
 Although only the United States responded to the Public Administrator's appeal of the choice-of-law issue, at the time the motion was made Eastern was still actively engaged in the litigation. Thus, the contacts of both defendants are relevant here. Eastern is incorporated in the State of Delaware and has its principal place of business in Florida. It does substantial business in New York. The United States, of course, is neither incorporated nor domiciled in any one state. If either defendant were domiciled in New York this would be a much easier case. Even though one court has reached a contrary conclusion concerning the importance of a defendant's New York domicile when this is also the tort locus, see Haydu v. Hosp. for Joint Diseases Orthopaedic Inst., 557 F.Supp. 577 (S.D.N.Y.1983), we believe that the second Neumeier rule, see supra note 7, while not necessarily applicable to wrongful death actions, suggests that the New York Court of Appeals would apply its own law if the defendants were domiciled in New York and the tort occurred there. See Walkes v. Walkes, infra
 
 
 [13]
 Under the principles espoused by the late Professor Brainerd Currie--the leading exponent of "interest analysis"--the forum court would normally apply its own law unless the court found that another state had an interest in the application of its policy and the forum state had no interest. See Notes on Methods and Objectives in the Conflict of Laws, 1959 Duke L.J. 171, reprinted in B. Currie, Selected Essays on the Conflict of Laws, 177, 183-87 (1963). Thus, under this system, in cases where a true conflict exists or the forum state is disinterested it would apply its own law. Id. In contrast, under the system of interest analysis that New York has evidently adopted, see Cousins, supra; Neumeier, supra; see generally Korn, supra note 6, at 880-81, the law of the place of the wrong normally applies unless another state has a significant interest in the application of its own law. Under either approach New York law would be applied in this case since the place of the wrong and the forum are the same, and since Greece has not demonstrated that it has an interest significant enough to displace the normal rule
 
 
 [14]
 Prejudgment interest in a wrongful death action under the New York statute is considered to be a matter of substantive law. See Circle Line Sightseeing Yachts, Inc. v. Storbeck, 325 F.2d 338, 341 (2d Cir.1963); Davenport v. Webb, 15 A.D.2d 42, 222 N.Y.S.2d 566 (1st Dep't 1961), aff'd, 11 N.Y.2d 392, 183 N.E.2d 902, 230 N.Y.S.2d 17 (1962)
 Under New York law prejudgment interest starting from the date of death is added to the damage award. N.Y.Est.Powers & Trusts Law Sec. 5-4.3 (McKinney 1981). Interest is calculated at a rate of 6% to June 25, 1981 and 9% thereafter. N.Y.Civ.Prac.Law Sec. 5004 (McKinney & Supp.1983). Thus, the amount of interest on $75,000 from the date of Hadzis' death until Eastern's deposit with the Clerk of the Court would be $31,604.79.
 
 
 [15]
 For a history of the Warsaw Convention, which was adopted in 1934, see Lowenfeld & Mendelsohn, The United States and the Warsaw Convention, 80 Harv.L.Rev. 497 (1967)
 
 
 [16]
 Article 17 of the Convention, under the chapter providing for the liability of carriers, states that:
 The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking.
 See supra note 3.
 
 
 [17]
 The Montreal Agreement did not, however, affect Article 25 of the Convention which provides for recovery beyond the limitation amount if the plaintiff proves "wilful conduct" on the part of the carrier
 
 
 [18]
 The Warsaw Convention also makes no reference to the payment of prejudgment interest. Moreover, the agreement raising the liability limit to $75,000 was intended to be only an interim provision. See 1 L. Kreindler, Aviation Accident Law Sec. 12A.07 (1983); Lowenfeld & Mendelsohn, supra note 15, at 596. Indeed, the viability of the liability limitation provisions appears to be diminishing due to economic changes. See Franklin Mint Corp. v. Trans World Airlines, Inc., 690 F.2d 303 (2d Cir.1982), cert. granted, --- U.S. ----, 103 S.Ct. 3084, 77 L.Ed.2d 1347 (1983) (cargo loss limitation of liability provision of Article 22 prospectively unenforceable because of fluctuating gold prices)
 
 
 [19]
 In Reed we held that airline employees are shielded by the liability limitation provision of the Warsaw Convention, as modified by the Montreal Agreement. We stated that:
 To permit a suit for an unlimited amount of damages against a carrier's employees for personal injuries to a passenger would unquestionably undermine this purpose behind Article 22, since it would permit plaintiffs to recover from the carrier through its employees damages in excess of the Convention's limits.
 555 F.2d at 1089.
 
 
 [20]
 None of the cases that the Public Administrator has cited in support of the proposition that the $75,000 amount is subject to prejudgment interest is persuasive. However, after oral argument in this case, the Court of Appeals for the Fifth Circuit rendered its decision in Domangue v. Eastern Air Lines, Inc., 722 F.2d 256 (5th Cir.1984). In that case, another wrongful death action arising out of the crash of Flight 66, the fifth circuit reversed the lower court and held that prejudgment interest above the $75,000 limitation is permitted under the Convention. While observing that prejudgment interest on unliquidated tort claims was not favored in the common law, the court noted that it had awarded prejudgment interest in cases involving Title VII and unfair labor practices, among others, where it found that such an award was necessary to effectuate the underlying goals of the laws. Id. at 262-63. Turning to the legislative history of the Agreement, the court asserted that an important American goal at the Montreal Conference was to encourage the speedy resolution of claims by eliminating the issue of fault. To that end an absolute liability provision was adopted. Reasoning that "[a] potential award of pre-judgment interest advances the objective of encouraging speedy compensation to victims," id. at 264, the court held that "awarding pre-judgment interest is permissible under the Warsaw/Montreal body of law and is within the discretion of the court." Id. at 263
 The instant case, however, differs significantly from Domangue. Here the plaintiff seeks an award of prejudgment interest pursuant to state law. As we noted, and as the fifth circuit acknowledged, this is contrary to one of the major objectives of the Convention, namely the establishment of a "uniform body of world-wide liability" rules. See Reed, supra, 555 F.2d at 1090; see also Domangue, supra, 722 F.2d at 262 ("[T]he Warsaw Convention and Montreal Agreement were intended to act as a uniform international law which supplants each member nation's varied laws.") (citation omitted).
 Moreover, we do not agree with the fifth circuit's interpretation of the Montreal Agreement. The speedy resolution of claims was apparently not an important United States objective at the conference. See Lowenfeld & Mendelsohn, supra note 15, at 572. The principal purpose of the United States at the Montreal Conference was to increase the liability limit to $100,000. The absolute liability provision was introduced as a means of getting the United States to accept a liability limit lower than $100,000, see id. at 563, 570-71, and was not one of the prime objectives of the American delegation. See id. at 572 ("The United States delegation was itself divided on [this] issue, and its instructions were not firm on the point."). Thus, the payment of prejudgment interest would not advance any of the underlying objectives of the Convention or the Agreement, but it would undercut, as we discussed above, two of the Convention's major objectives.
 Finally, even if we were to adopt the fifth circuit's discretionary approach, as the district court noted, this case would not be an appropriate one for an award of prejudgment interest. After an initial question was settled regarding who would represent the Hadzis estate, see Winbourne v. Eastern Air Lines, Inc., 632 F.2d 219, 224-25 (2d Cir.1980), the Public Administrator contested the application of the $75,000 limitation. Although he now contends that Eastern was liable for payment in full shortly after the crash, he argued, until the court granted Eastern's motion for partial summary judgment on this issue, that the provision did not apply because of a defect in Hadzis' ticket.
 
 
 [21]
 We note that contrary to the government's contention surprise is not one of the enumerated grounds for the exclusion of evidence under Federal Rule of Evidence 403. In fact, the Advisory Committee's Note to Rule 403 points out that surprise should not be a ground for exclusion of evidence and that "the granting of a continuance is a more appropriate remedy than exclusion of evidence." See also 1 J. Weinstein & M. Berger, supra, p 403, at 403-12 to -13. While there may be some situations in which unfair surprise alone would constitute a ground for the exclusion of evidence under Rule 403, see F & S Offshore, Inc. v. K.O. Steel Castings, Inc., 662 F.2d 1104, 1107-08 (5th Cir.1981) (per curiam); cf. C. McCormick, Evidence Sec. 185, at 440 (2d ed. 1972), we express no opinion on this matter at this time
 
 
 [22]
 In its Findings of Fact and Conclusions of Law the district court found: that Hadzis was a 31 year old Greek sailor who had obtained the rank of chief mate at the time of his death; that he would have been promoted to captain not long after the crash; that he was away from home an average of ten months a year; that his gross earnings for the twelve months before his death were $18,482; that he earned an annual $2,000 bonus for work related to the loading and unloading of ships, a bonus which brought his gross income to $20,482 for the twelve months before his death; that with a life expectancy of 75 years he could continue to work as a captain until age 62.5; that he would be eligible for a pension at age 50, even if he continued working; that at his death he was married and had two small children--one age 4 1/2 and the other age 11 months; that during one of the two months that he was home on leave he did the necessary repairs around the house; that he was the sole support for his wife and children; that he provided approximately $2,000 per annum to his parents; that based on the testimony of plaintiff's two witnesses--Spyros Varras ("Varras"), the American representative for the PanHellenic Seamen's Federation, and Bunin, an actuarial economist--the "total offset" method was the appropriate means to determine the present value of the award for lost future earnings; that until age 50 80% of Hadzis' income would have gone to support his family and that thereafter, from age 50 to 75, the figure would have been 70%; and that, for Hadzis' wrongful death, the decedent's estate was entitled to $982,100 which included, among other things, $75,000 for each child for loss of guidance and $44,000 for loss of services to Mrs. Hadzis. See Decision and Order, O'Rourke v. Eastern Air Lines, Inc., 76 Civ. 1025 (HB), dated June 21, 1982, reprinted in J.A. at 234-53
 The award can be summarized as follows:
 Past lost support $117,000
Future lost support 668,000
Loss of guidance 150,000
Loss of services 44,000
Funeral services 3,100
 --------
 $982,100
 
 
 [23]
 The government also argues that the excessiveness of the award is demonstrated by its size relative to other wrongful death awards in factually similar cases, and by the fact that, if the award were conservatively invested, the first annual return would yield an amount much greater than the decedent's last annual salary. Both contentions are specious
 As this Court has previously pointed out, a "simplistic comparison of current bond yields with [the decedent's annual] income ignores the complexity of this (and almost every) damage-award calculation." Vasina v. Grumman Corp., 644 F.2d 112, 119 (2d Cir.1981). Indeed, it is premised on a basic misunderstanding of the economic principles that must be considered in calculating the present value of a lump sum award for lost future earnings in an inflationary economy. See generally Jones & Laughlin Steel Corp. v. Pfeifer, supra, 103 S.Ct. at 2550-55; Doca v. Marina Mercante Nicaraguense, S.A., 634 F.2d 30, 34-39 (2d Cir.1980), cert. denied, 451 U.S. 971, 101 S.Ct. 2049, 68 L.Ed.2d 351 (1981); Note, Determining the Effect of Inflation on Lost Future Earnings: What Price Equity?, 57 St. John's L.Rev. 316 (1983).
 As for any comparison to other wrongful death awards, "[i]t is recognized [under New York law] that there is no magic or precise mathematical formula for computing damages in a case of this kind and, since an award [for wrongful death] must be based upon intangible pecuniary losses, it is not surprising that differences of opinion occur. Each case is necessarily different." Rinaldi v. State, 49 A.D.2d 361, 374 N.Y.S.2d 788, 792 (3d Dep't 1975). See also Brock v. State, 77 A.D.2d 670, 429 N.Y.S.2d 778 (3d Dep't 1980).
 
 
 [24]
 Although both the government and the Public Administrator assumed on appeal that our recent decision in Doca, supra, governs the issue of discounting, we must first look to New York law. While a number of states have adopted a form of discounting that takes inflation into account, see, e.g., Kaczkowski v. Bolubasz, 491 Pa. 561, 421 A.2d 1027 (1980); see generally Pfeifer, supra, 103 S.Ct. at 2551; Note, supra note 23, at 329 n. 59, New York law on this point is relatively undeveloped. See Dennis v. Dachs, 85 A.D.2d 223, 448 N.Y.S.2d 1 (1st Dep't 1982), see also Dullard v. Berkeley Assocs. Co., 606 F.2d 890, 896 (2d Cir.1979). While it is impossible to predict the method, if any, that the Court of Appeals will adopt to determine the role that inflation should play in the discounting of damage awards, cf. Feldman v. Allegheny Airlines, Inc., 524 F.2d 384, 390-93 (2d Cir.1975) (Friendly, J., concurring dubitante), there is no basis for concluding that the Court of Appeals would rule that the method applied by the lower court in this case was incorrect as a matter of New York law
 
 
 [25]
 Indeed, the plaintiff attempted to introduce evidence to prove that a negative discount figure should be applied to increase the amount of the award. See supra discussion at page 23
 
 
 [26]
 In Stratis, a damage action brought by a Greek seaman who survived the crash of Eastern Flight 66, we held that "the testimony about past and future losses, presented through a Greek lawyer rather than a person expert in the marine industry, is insufficient to support the award." 682 F.2d at 415. This case is clearly distinguishable. Plaintiff's expert witness, Bunin, is an actuarial economist. Moreover, the method that Bunin used to determine the lost income--a projection of future wages based upon past labor contracts and wage statistics--has been recently approved by a lower New York court. See Dennis v. Dachs, supra
 
 
 [27]
 The government argues that, based on the data supplied by plaintiff's expert and the analysis in Doca, supra, a 10%, 5% or 2% discount rate would be more appropriate than the total offset method. The alternate percentages were derived from various scenarios in which some of the assumptions put forward by the plaintiff's expert are accepted and others rejected
 
 
 [28]
 Thus, the support figures for the years prior to Hadzis reaching age 50 would be reduced from 80% to 70% and from age 50 to 75 from 70% to 60%. See Findings 47-48, 51-58, J.A. at 242, 243-44
 
 
 [29]
 It is unclear from the record whether the $2,500 that Hadzis was carrying with him on the trip was for his personal use or the use of his family, or some combination thereof
 
 
 [30]
 The amounts awarded would be reduced to the following figures:
 Past lost support $102,375
Future lost support 577,506
Loss of guidance 75,000
Loss of services 22,000
Funeral expenses 3,100
 --------
 $779,981