ILIJA RAKARIC, an Infant by IVAN RAKARIC, His Father, et al., Appellants, v CROATIAN CULTURAL CLUB "CARDINAL STEPINAC ORGANIZATION", Respondent.

Second Department, August 11, 1980

## APPEARANCES OF COUNSEL

*Mokotoff & Mondshine (Michael Rosoff* and *Milton M. Mokotoff* of counsel), for appellants.

*Charles Fischer (Henry Ethan Sirotko* on the brief), for respondent.

## OPINION OF THE COURT

GIBBONS, J.

This action was instituted to recover damages for personal injuries sustained by the infant plaintiff, Ilija Rakaric, a New York resident then 15 years of age, and for derivative damages by his father, Ivan Rakaric, against the defendant, the Croatian Cultural Club "Cardinal Stepinac Organization", a New Jersey corporation, organized under the laws of New Jersey. The accident occurred on August 11, 1973 upon certain unimproved real property owned by the said defendant and located at Boonton, New Jersey, where the infant plaintiff was injured by a chain saw while engaged as a volunteer in clearing the property.

In its answer, the defendant alleges, as a complete affirmative defense to the action, that, pursuant to section 2A:53A-7 of the New Jersey Revised Statutes, it is immune from liability for negligence due to its status as a nonprofit corporation, society or association organized exclusively for religious, charitable, educational or hospital purposes.

The question presented for resolution on this appeal is whether, under the facts and circumstances of this case, section 2A:53A-7 of the New Jersey Revised Statutes, which confers immunity from liability for negligence upon a nonprofit corporation, society or association organized exclusively for religious, charitable, educational or hospital purposes, shall be applied in favor of the defendant under the rule of *lex loci delicti,* or whether, as the plaintiffs contend, the affirmative defense asserting such immunity contained in the defendant's answer should be dismissed as being legally insufficient and without merit, under CPLR 3211 (subd [b]).

The Croatian Cultural Club "Cardinal Stepinac Organization" was organized under the laws of the State of New York in 1971, with its office address at 502 W. 41st Street, New York City, and the defendant corporation, bearing the same name, was organized under the laws of the State of New Jersey in 1973, with its registered office address at 416 39th Street, Union City, New Jersey, c/o John J. Munro, an attorney.

These corporations function in close association with, and in furtherance of the religious and beneficent purposes of Saint Cyril's Church, which is located at 502 W. 41st Street, New York City. Father Mladen Cuvalo is the pastor of the church

and a member of the board of directors of both corporations. He resides at 502 West 41st Street, New York City. The land upon which the accident occurred consists of undeveloped acreage in Boonton, New Jersey, which the defendant corporation acquired in May, 1973 for the purpose of developing for sports and recreational use.

Many members of the Croatian Cultural Club "Cardinal Stepinac Organization" were also worshippers at Saint Cyril's Church. The plaintiff Ilija Rakaric (hereafter plaintiff), and his family, worshipped at the church for three years, and, on some occasions, he attended defendant's cultural center in New York City.

In its effort to clear the New Jersey land, the volunteer services of the members of the parish were sought. Announcements and solicitations for such volunteers were made in the church bulletin and by radio broadcasts on Saturdays and Mondays over radio station WHBI. Such announcements were made as early as June, 1973 in which the project was publicized and volunteers were invited to assist in clearing the property. Travel instructions from New York to the site were given and for those who had no cars, transportation would be furnished by the pastor.

The plaintiff, at the time of the accident, resided with his parents in Queens County, New York, and was a student at the Aviation High School in New York. In response to the call for volunteers, he left his home by train and met Father Cuvalo at 50th Street, Manhattan, where he got into a limousine and was driven with several other volunteers to Boonton, New Jersey, by the pastor. The party arrived at about 9:30 A.M. Tools, including three chain saws which were furnished by the defendant, were distributed to the workers. One of the chain saws was handed to a Mr. Saric, a family friend of the plaintiff who resided in Queens County, New York, and who had also volunteered to work and had traveled to the 50th Street meeting place with the plaintiff. While Mr. Saric was in the process of cutting down a tree, the chain saw came in contact with the plaintiff and caused injury to his leg.

Heretofore, the courts of New York had inflexibly applied the doctrine of *lex loci delicti* in determining that the law of the situs be applied in all tort actions with multistate contacts (*McDonald v Mallory,* 77 NY 546; *Poplar v Bourjois, Inc.,* 298 NY 62).

The inappropriateness of this rigid approach to the resolu-

tion of a choice of law problem based on the law of the situs, under certain circumstances, was first recognized with respect to the related doctrine of *lex loci contractus*. In *Rubin v Irving Trust Co.* (305 NY 288, 305), the court determined that the law to be applied in contractual disputes having interstate connections would be based on the "center of gravity" or "grouping of contacts" theory. This rule was followed in *Auten v Auten* (308 NY 155, 161), where the court held that "[a]lthough this 'grouping of contacts' theory may, perhaps, afford less certainty and predictability than the rigid general rules * * * the merit of its approach is that it gives to the place 'having the most interest in the problem' paramount control over the legal issues arising out of a particular factual context".

The first departure from the rule of *lex loci delicti* appears to have been declared in *Kilberg v Northeast Airlines* (9 NY2d 34), which involved an airplane accident in Massachusetts in which the plaintiff's intestate was killed. In refusing to apply the Massachusetts statutory limit of $15,000 for wrongful death, the New York court held (p 39) that "[t]he place of injury [is] entirely fortuitous. Our courts should if possible provide protection for our own State's people against unfair and anachronistic treatment of the lawsuits which result from these disasters." The court permitted a recovery for wrongful death under the Massachusetts statute but declined, on public policy grounds, to comply with its monetary limitation.

In *Babcock v Jackson* (12 NY2d 473), the Court of Appeals considered the applicability of the Ontario statute barring recovery of damages for ordinary injuries. In that action, which arose out of an accident in the province of Ontario, Canada, by a plaintiff passenger of an automobile bearing New York registration, against the operator, both parties being residents of the State of New York, Judge FULD, after tracing the development of the law, held (pp 481-482): "The 'center of gravity' or 'grouping of contacts' doctrine adopted by this court in conflicts cases involving contracts impresses us as likewise affording the appropriate approach for accommodating the competing interests in tort cases with multi-State contacts. *Justice, fairness and 'the best practical result' (Swift & Co. v. Bankers Trust Co., 280 N.Y. 135, 141, supra) may best be achieved by giving controlling effect to the law of the jurisdiction which, because of its relationship or contact*

*with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation. The merit of such a rule is that 'it gives to the place "having the most interest in the problem" paramount control over the legal issues arising out of a particular factual context' and thereby allows the forum to apply 'the policy of the jurisdiction "most intimately concerned with the outcome of [the] particular litigation." ' (Auten v. Auten,* 308 N.Y. 155, 161, *supra.)"* (Emphasis added.)

In the process of the evolution of the "center of gravity" or "grouping of contacts" doctrine enunciated by *Babcock,* the Court of Appeals, in *Tooker v. Lopez* (24 NY2d 569), held, with respect to an action involving an accident in the State of Michigan which had a guest statute in force that, when the guest passenger and host driver were both residents of this State, and the car was registered and insured in this State, in order to prevent the onerous effect of the Michigan law which would prevent a recovery by the plaintiff resident of New York, the law of New York applied, and not the law of Michigan, the place of the accident.

A subsequent case, *Neumeier v Kuehner* (31 NY2d 121), presented the court with a factual situation where the defendant's intestate, a resident of New York, while operating his motor vehicle in Ontario, Canada, collided with a train which resulted in his death and the death of his guest passenger, a resident of Ontario. The court there held, in denying a motion by the representative of the deceased passenger to strike an affirmative defense setting up the Ontario guest statute, that Ontario law, the *lex loci delicti,* should govern.

The rationale of the *Neumeier* court, as distinguished from the finding in *Tooker,* is stated as follows (pp 125-126): "What significantly and effectively differentiates the present case is the fact that, although the host was a domiciliary of New York, *the guest, for whose death recovery is sought, was domiciled in Ontario,* the place of accident and the very jurisdiction which had enacted the statute designed to protect the host from liability for ordinary negligence. It is clear that, although New York has a deep interest in protecting its own residents, injured in a foreign state, against unfair or anachronistic statutes of that state, it has no legitimate interest in ignoring the public policy of a foreign jurisdiction—such as Ontario—and in protecting the plaintiff guest domiciled and injured there from legislation obviously addressed, at the very

least, to a resident riding in a vehicle traveling within its borders." (Emphasis added.)

In the explanation of why, under a factual background such as in *Neumeier,* the *Babcock* rule must yield to the *lex loci delicti,* Judge BREITEL, in his concurring opinion, stated (pp 131-132) as follows:

"*[L]ex loci delictus* is unsoundly applied if it is done indiscriminately and without exception. It is still true, however, that *lex loci delictus* is the normal rule, as indeed Chief Judge FULD noted in the *Tooker* case (24 N Y 2d 569, *supra), to be rejected only when it is evident that the situs of the accident is the least of the several factors of influences* to which the accident may be attributed (for discussion, see dissenting opn. in *Tooker v. Lopez,* 24 N Y 2d, at pp. 595-596). * * *

"Consequently, I agree that there should be a reversal and the defenses allowed to stand. The conclusion, however, rests simply on the proposition that *plaintiff has failed by her allegations to establish that the relationship to this State was sufficient to displace the normal rule that the lex loci delictus should be applied,* the accident being associated with Ontario, from inception to tragic termination, except for adventitious facts and where the lawsuit was brought." (Emphasis added.)

Measured against this background of *Babcock* and its progeny, which reflect the rationale that the choice of law will be determined by the "center of gravity" or "grouping of contacts" doctrine where the protection was required *"for our own State's people* against unfair and anachronistic treatment" *(Kilberg v Northeast Airlines,* 9 NY2d 34, 39, *supra)* of foreign laws, the question squarely presented here is whether, under the circumstances of this case, *Babcock* should be applied or whether the old rule of *lex loci delicti* should prevail, solely because the accident happened on the defendant's land in New Jersey.

The resolution of this appeal now requires a review of the New York law in relation to the concept of a rule of law affording immunity from liability for tort to charitable institutions.

In 1957 the Court of Appeals, in *Bing v Thunig* (2 NY2d 656), held that such immunity was contrary to the public policy of this State. In *Bing* the plaintiff, while a patient in the St. John's Episcopal Hospital, was severely burned by her surgeon when he, while using a heated electric cautery, ig-

nited a sheet upon which she was lying which had been negligently impregnated with a flammable antiseptic solution.

The reason then advanced by the court to abandon the doctrine of immunity from liability for tort theretofore accorded charitable institutions, is stated as follows (pp 666-667):

"Hospitals should, in short, shoulder the responsibilities borne by everyone else. There is no reason to continue their exemption from the universal rule of *respondeat superior.* The test should be, for these institutions, whether charitable or profit-making, as it is for every other employer, was the person who committed the negligent injury-producing act one of its employees and, if he was, was he acting within the scope of his employment.

"The rule of nonliability is out of tune with the life about us, at variance with modern-day needs and with concepts of justice and fair dealing. It should be discarded. To the suggestion that *stare decisis* compels us to perpetuate it until the legislature acts, a ready answer is at hand. It was intended, not to effect a 'petrifying rigidity,' but to assure the justice that flows from certainty and stability. If, instead, adherence to precedent offers not justice but unfairness, not certainty but doubt and confusion, it loses its right to survive, and no principle constrains us to follow it. On the contrary, as this court, speaking through Judge DESMOND in *Woods v. Lancet* (303 N. Y. 349, 355), declared, we would be abdicating 'our own function, in a field peculiarly nonstatutory,' were we to insist on legislation and 'refuse to reconsider an old and unsatisfactory court-made rule.'

"In sum, then, the doctrine according the hospital an immunity for the negligence of its employees is such a rule, and we abandon it. The hospital's liability must be governed by the same principles of law as apply to all other employers."

In 1958 the Appellate Division in this Department was confronted with *Kaufman v American Youth Hostels* (6 AD2d 223). This case required a determination of the question of choice of law under the following circumstances:

The plaintiff's intestate, a 15-year-old girl, had been enrolled with a *domestic* charitable corporation which conducted a group of children, including the plaintiff's daughter, on a climb of Mount Hood in the State of Oregon. The girl met her death by falling from the mountain.

The action was commenced by the child's father to recover

damages "under sections 30.010 and 30.020 of the Oregon Revised Statutes, in his separate capacities of father of the child and administrator of her estate" (p 225).

Two separate affirmative defenses, designated as the first and third, were interposed. Both were stricken by Special Term on the ground of legal insufficiency. The first was that the defendant was an eleemosynary institution and, therefore, immune from liability for tort. The third affirmative defense was that the child and her parents had executed an agreement, prior to the commencement of the tragic trip, purporting to release the defendant from liability.

The plaintiff's position was twofold. He claimed, on the one hand, that the doctrine of immunity from liability for tort, granted to a charitable institution, had been rejected *in toto* by the State of New York in *Bing v Thunig* (2 NY2d 656, *supra*) and, on the other hand, that Oregon has not "categorically indicated that it would extend its rule [of immunity] to a New York corporation" (p 226).

In approaching the resolution of the appeal, the *Kaufman* court, by WENZEL, J., circumscribed its consideration of the issues as follows (p 225): "The sufficiency of the first defense must be determined according to the law of Oregon, since it is the law of the place where the alleged tortious wrong was committed that governs the question of whether the actor is liable *(Poplar v. Bourjois, Inc.,* 298 N. Y. 62). On the other hand, the sufficiency of the third defense must be determined according to the law of New York, since that is the State which had the most significant contacts with the matter in dispute *(Auten v. Auten,* 308 N. Y. 155, 160)."

At the very outset, it is to be observed that on the question of the choice of law in relation to substantive liability for tort, the court opted to apply the *lex loci delicti* and adopt the rule of immunity prevailing in Oregon. Since the release agreement was executed in New York, the court elected to apply the principle of "significant contacts" of *Auten v Auten (supra)* and to determine the sufficiency of the third defense by utilization of New York law. *Kaufman* was affirmed in 1959 in 5 NY2d 1016.

In my opinion, this course was adopted for the very logical reason that, in 1958 when *Kaufman* was decided by the Appellate Division, and thereafter upheld by the Court of Appeals in 1959, the law had yet to wait two more years until the beginning of the relaxation from the rule of *lex loci delicti*

in tort cases as first expressed in *Kilberg v Northeast Airlines (supra)*, (1961), and ultimately four more years until the decision in *Babcock v Jackson, supra* (1963), which established the rule applying the "center of gravity" or "grouping of contacts" to determine the choice of law as opposed to the prior universally accepted rule of *lex loci delicti.*

Under the present state of our law, as stated in *Neumeier v Kuehner* (31 NY2d 121, *supra*) and repeated in *Cousins v Instrument Flyers* (44 NY2d 698, 699), the doctrine of *"lex loci delicti* remains the general rule in tort cases to be displaced only in extraordinary circumstances". This case presents a factual situation which impels the conclusion that such "extraordinary circumstances" do exist, and, thus, the case warrants a departure from that rule since a resident of the State of New York is involved in this case whose rights will be impaired by a doctrine of charitable immunity from liability for tort, which has not only been completely rejected by this State in *Bing v Thunig* (2 NY2d 656, *supra*) in 1957, but, likewise, in other jurisdictions including Oregon whose statute was *sub judice* in *Kaufman.* In *Blum v American Youth Hostels* (21 AD2d 683, 684), in affirming an order dismissing a similar affirmative defense of immunity from liability for tort, this court held: "Since Oregon has overruled its earlier decisions which conferred upon charitable institutions immunity from liability for the torts of their servants *(Hungerford v. Portland Sanitarium & Benevolent Assn.,* 384 P. 2d 1009 [Ore., 1963]; *Wicklander v. Salem Memorial Hosp.,* 385 P. 2d 617 [Ore., 1963]), the rule as to the immunity of a charitable institution from liability for acts of negligence committed by it in Oregon, as enunciated in *Kaufman v American Youth Hostels* (6 A D 2d 223, mod. in other respects 5 N Y 2d 1016), is no longer applicable."

The doctrine of charitable immunity has been the subject matter of ever increasing rejection on a nationwide scale for the past several decades and had been discontinued by over 31 States by 1971.[*]

---

[*] In Law of Torts (4th ed [1971], § 133, p 996), by William L. Prosser, the diminishing of the charitable immunity doctrine on a nationwide basis, as of the time of publication of that treatise, is described as follows:

"Prior to 1942 only two or three courts had rejected the immunity of charities outright. In that year a devastating opinion[67] of Judge Rutledge in the Court of Appeals of the District of Columbia reviewed all of the arguments in favor of the immunity, and demolished them so completely as to change the whole course of the law. It has been followed by a deluge of decisions holding that there is no immunity

In denying the plaintiff's motion herein, Special Term placed substantial reliance upon *Belisario v Manhattan Motor Rental* (48 AD2d 477). It should be noted that *Belisario* concerned itself essentially with whether vicarious liability could be attached to an owner of a trailer. If section 388 of the Vehicle and Traffic Law of New York applied, such liability would be imposed. If, on the other hand, New Jersey law were to be applied, where such concept of vicarious liability does not exist against the owner of a vehicle for the misdeeds of his driver, no such liability would be imposed on the owner of the trailer.

In reversing a judgment of Special Term in which the *Babcock* doctrine was applied, the court, after clearly outlining the facts which demonstrated that the "center of gravity" under the "grouping of contacts" was in New Jersey, where the accident occurred, held as follows (p 480): "This is not an 'in transit' case but a 'fixed location' case. *Nor is it a case where protection is required 'for our own State's people against unfair and anachronistic treatment.'*" (Emphasis added.)

*Belisario* is the proper determination for the factual situation presented there. However, it provides no authority for the

---

at all, and that a charity is liable for its torts to the same extent as any other defendant. As of the date of publication, the number of jurisdictions which have jettisoned the charity's immunity entirely has reached a total of thirty-one;[68] and the list has been increasing rapidly as older decisions have been overruled.[69]

"In short, the immunity of charities is clearly in full retreat; and it may be predicted with some confidence that the end of the next two decades will see its virtual disappearance from American law. * * *

"67. President and Directors of Georgetown College v. Hughes, 1942, 76 U.S.App.D.C.123, 130 F.2d 810. See also the very complete review in the dissent of Brand, J., in Landgraver v. Emanuel Lutheran Charity Board, 1955, 203 Or. 489, 280 P.2d 301. The majority held that any change must be for the legislature.

"68. Currently the list includes Alaska, Arizona, California, Delaware, District of Columbia, Florida, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nevada (statute), New Hampshire, New York, North Dakota, Oklahoma, Oregon, Pennsylvania, Puerto Rico, Utah, Vermont, Washington, West Virginia, Wisconsin, and Wyoming.

"69. Late decisions are Colby v. Carney Hospital, 1969, — Mass. —, 254 N.E.2d 407; Abernathy v. Sisters of St. Mary's, Mo.1969, 446 S.W.2d 599; Harris v. Young Women's Christian Ass'n, 1968, 250 Ind. 491, 237 N.E.2d 242; Bell v. Presbytery of Boise, 1966, 91 Idaho 374, 421 P.2d 745; Darling v. Charleston Community Mem. Hospital, 1965, 33 Ill. 2d 326, 211 N.E.2d 353 cert. denied 383 U.S. 946; Flagiello v. Pennsylvania Hospital, 1965, 417 Pa. 486, 208 A.2d 193; Adkins v. St. Francis Hospital, 1965, 149 W.Va. 705, 143 S.E.2d 154; Lutheran Hospitals & Homes Soc. of America v. Yepsen, 1970, — Wyo. —, 469 P.2d 409."

resolution of the issues in the instant matter which concerns the application of the archaic rule of charitable immunity which would tend to deprive a New York resident of recourse for the injury he sustained. Actually, the last sentence quoted above from *Belisario* makes it very clear that even in a so-called "fixed location" case, the "center of gravity" and "grouping of contacts" rule may be applied where "protection is required 'for our own State's people against unfair and anachronistic treatment'". This is such a case, and reference is now made to the opinion in *Rosenthal v Warren* (374 F Supp 522), which was a "fixed location" case as distinguished from an "in transit" case and which involved the question whether New York would apply the Massachusetts doctrine of charitable immunity in a wrongful death action instituted by a New York decedent's estate to recover damages as a result of medical malpractice committed in the State of Massachusetts by residents of that State.

The legal history of the *Rosenthal* case involved two questions. In the first phase of that litigation, the plaintiff challenged the application of the Massachusetts wrongful death statute which limited recoverable damages to not less than $5,000, nor more than $50,000. The court (342 F Supp 246) struck defendant's affirmative defense setting up such statute holding that the New York courts, faced with such fact situation, would apply the New York law which does not so limit recovery in a wrongful death action.

This determination was affirmed on appeal (475 F2d 438) where Judge OAKES, writing for the majority, and after reviewing the changes in the state of the law of New York in relation to the "wooden rule that the law of the place of the tort inevitably governed" (p 441), held:

"[A]s we view it, the New York courts would balance against the New York interest in protecting its domiciliaries against wrongful death limitations the interests of Massachusetts in limiting damages for wrongful deaths allegedly caused by Massachusetts citizens or occurring in Massachusetts. * * *

"In any event, it is our considered view that the New York Court of Appeals would view the Massachusetts limitation, in the words of Justice Hatch (note 3 *supra),* as so 'absurd and unjust' that the New York policy of fully compensating the harm from wrongful death would outweigh any interest Massachusetts has in keeping down in this limited type of situa-

tion the size of verdicts (and in some cases insurance premiums)" (pp 444-445).

The second phase of the *Rosenthal* litigation dealt with the specific question, now considered here, concerning the sufficiency of the affirmative defense of immunity from liability afforded a charitable institution by the laws of Massachusetts (374 F Supp 522, *supra).* The court, by Bauman, J., in striking such defense, held that, consonant with "interest analysis" approach of *Babcock v Jackson (supra)* and New York's deep interest in protecting its citizens injured in a foreign State against unfair and archaic doctrines of foreign States under *Neumeier v Kuehner (supra),* such affirmative defense was without merit.

The court held as follows (pp 524-526):

"No New York decision dealing with the *charitable immunity doctrine of a foreign state has reached the choice of law question* since the rejection of the rigid *lex loci delicti* approach by Babcock v. Jackson, 12 N.Y.2d 473 * * * (1963). What faces me then, is a question not previously addressed by this court, the New York Court of Appeals or the Second Circuit. * * *

"New York's 'interest analysis' approach to choice of law problems was first enunciated by Judge Fuld in Babcock v. Jackson, supra, which sounded the death knell of the rigid rule that the law of the place of the tort inevitably governs. Looking toward achieving 'justice, fairness and the best practical result' the New York Court of Appeals directed that courts give 'controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties has the greatest concern with the specific issue raised in the litigation.' As it went on to say 'the merit of such a rule is that it gives to the place having *the most interest* in the problem paramount control over the legal issues arising out of a particular factual context.' * * *

"Additionally, the New York courts have stressed the state's deep interest in protecting its citizens injured in a foreign state against unfair, anachronistic, or archaic doctrines. Neumeier v. Kuehner, 31 N. Y. 2d 121, 125 * * * (1972). One is hard pressed to conceive of a more fitting rubric for the doctrine of charitable immunity. * * *

"Recognizing the fact that New York's interest in protecting its citizens here is identical to that involved in *Rosenthal,* I further conclude that the high court of that state would rule

no differently with respect to charitable immunity than it did with wrongful death recovery limitations: that it is unfair, out of step with the times and abhorrent to the public policy embodied in Article 1, § 16 of the New York Constitution. * * *

"Any doctrine as archaic as this one, founded on medieval views of charity, harshly criticized by virtually all the commentators, and abolished judicially or by legislative act in all but three or four states, belongs to the scholars who concern themselves with antiquity and does nothing but violence to New York's expressed vital interest in the compensation of its domiciliaries."

After considering the historical basis for the charitable immunity rule, the court pointed out that with the advent of the universal use of liability insurance in modern times, the reason for the rule no longer exists. It held (p 525, n 17): "The charitable immunity doctrine was designed, in part, to protect the assets of charitable trusts from dissipation by the 'hungry maw of litigation,' thus conserving them for the benefit of the many rather than the compensation of the few. Ettlinger v Trustees of Randolph-Macon College, 31 F2d 869 (4th Cir. 1929). *Today such a policy decision is no longer necessary. The advent of widespread insurance has made possible the full compensation of the injured without any significant diminution of the charitable funds.*" (Emphasis added.)

The ever changing demands of society have cast upon the courts an obligation to adjust the laws from time to time to such trends as may be necessary in order to achieve basic justice. This duty is described in *Woods v Lancet* (303 NY 349, 354) in the following language: "Negligence law is common law, and the common law has been molded and changed and brought up-to-date in many another case. Our court said, long ago, that it had not only the right, but the duty to re-examine a question where justice demands it *(Rumsey v. New York & N.E.R.R. Co.,* 133 N.Y. 79, 85, 86, and see *Klein v. Maravelas,* 219 N.Y. 383)." This rule was cited with approval in *Flanagan v Mount Eden Gen. Hosp.* (24 NY2d 427, 434).

It is my view that the time has come to adopt a course compatible with the policy of this State declared by the Court of Appeals in 1957 in *Bing v Thunig* (2 NY2d 656, 667, *supra),* that the doctrine of charitable immunity is "out of tune with the life about us, at variance with modern-day needs and with the concepts of justice and fair dealing" and "[i]t should be

discarded", and to utilize the opportunity given to us by *Babcock* to relieve the people of this State from the shackles which the *Kaufman* court was unable to do because, under the state of the law prevailing at that time, the rule of *lex loci delicti* was rigid and exclusive.

By the application of the rule expressed in *Babcock,* the "center of gravity" under a "grouping of contacts" in the instant matter points to utilization of New York law for the following reasons:

Here, the infant plaintiff, at the time of the accident, was a domiciliary of the State of New York, residing with his parents and attending public school in Queens County. He and his parents had previously attended worship services and some social activities at St. Cyril's parish at 502 W. 41st Street, New York City, which was also the address for the Croatian Cultural Club "Cardinal Stepinac Organization", a New York corporation; that the infant plaintiff was solicited in New York by radio broadcast to volunteer to do land clearing labor on the day in question on the real property at Boonton, New Jersey, of the defendant, Croatian Cultural Club "Cardinal Stepinac Organization", a corporation organized under the laws of New Jersey; that, in response to such solicitation, the infant plaintiff left his home in Queens County on August 11, 1973 and proceeded to a point in New York City where he entered a church limousine driven by Father Cuvalo, the pastor of the church, with several other persons, to the land in Boonton, New Jersey, where the accident happened while he was engaged in land clearing work; and that, after the occurrence, the infant plaintiff eventually returned to his home in New York.

The New York State policy of assuring full recourse in its own courts for injuries sustained by its domiciliaries outweighs any interest New Jersey may have in favoring its charitable institutions with the grace of immunity from liability for tort. I am also of the view that the claim asserted here that the defendant did not provide liability insurance for its land in New Jersey because it was not required under the law of New Jersey is wholly without any merit in this modern day when insurance is an acceptable burden of property ownership.

Indicative of the present trend of the law in relation to questions of choice of law in tort actions having multistate contacts and worthy of note in the consideration of this

matter is the decision in *Wuerffel v Westinghouse Corp.* (148 NJ Super 327), which was a "fixed location" case involving a New Jersey resident against Drexel University, a Pennsylvania corporation, for damages for personal injuries sustained in New Jersey. The plaintiff was a full-time engineering student of the university who had been recommended by it, under its co-operative education program, for employment by the U. S. Pipe & Foundry Co. in Burlington, New Jersey, where pipe was fabricated for Westinghouse Corp., and, while so engaged, he sustained serious injury to his leg resulting in its amputation. The plaintiff alleged that the university was negligent in the administration of the program in that it placed him in a position of danger without adequate warning or safeguards. After granting summary judgment in favor of the other corporate defendants, the court, in declining to permit the defendant Drexel University to assert as a defense the New Jersey statute granting immunity to charitable organizations, held as follows (p 333):

"New Jersey generally followed the *situs* rule in the 50's and early 60's, *but no longer does so.*

"In *Mellk v Sarahson,* 49 N.J. 266 (1967), New Jersey adopted the governmental interest analysis approach to supplant the *situs* approach for determining the applicable conflicts of law. *Mellk* requires a two-step analysis. The court first determines *the governmental policies evidenced by the laws of each related jurisdiction and determines which state has the paramount interest in having its law apply to the rights and liabilities of the parties.* Secondly, the court must review the *actual contacts* of the parties with each related jurisdiction." (Emphasis added.)

After applying the test of "governmental policies" and actual "contacts" to the facts of the case, the court determined the issue in favor of the plaintiff and declined to permit the defense to be asserted. It would appear from this holding that, at this time, the traditional principle of the law of the situs or *lex loci delicti* is relaxed and held not to apply in New Jersey when a foreign corporate defendant is involved.

The prevalence of the greater number of contacts with New York in the instant matter, coupled with the alternative of having to apply a rejected and archaic principle of charitable immunity under which an infant resident of New York will be left without legal recourse, requires that the rule of the situs be likewise denied here.

The order should be reversed on the law, the motion granted, and the first affirmative defense dismissed on the ground that it is insufficient and that it has no merit (see CPLR 3211, subd [b]).

Hopkins, J. P., Lazer and Gulotta, JJ., concur.

Order of the Supreme Court, Kings County, dated September 19, 1979 and amended on December 3, 1979, reversed, on the law, with $50 costs and disbursements, and motion to dismiss defendant's first affirmative defense granted.