*879 OPINION OF THE COURT
Kristin Booth Glen, J.
This case presents a simple question of first impression and broad application whose resolution requires exegesis of an exceptionally complicated body of law. The question is whether, absent extraordinary circumstances, the law of the place of a tort governs the issue of damages in a personal injury action arising out of that tort. The answer requires a close reading not only of New York cases, and Federal cases purporting to interpret and apply New York law, but also of scholarly controversy which has arisen out of the "conflicts-of-law revolution” which began with the New York Court of Appeals decision in Babcock v Jackson (12 NY2d 473 [1963]).
FACT AND PROCEDURAL POSTURE OF THE CASE
Plaintiff George Feldman sues for damages incurred as a result of an accident which he sustained using a slide into the saltwater pool of the Acapulco Princess Hotel in February 1981. In addition to damages for pain and suffering and lost income, Feldman alleges special damages for hospital and medical costs in excess of $29,000. Plaintiff Delores Feldman, his wife, asserts a derivative claim. Both plaintiffs are residents of the State of New York, and the defendants are residents of, and incorporated under the laws of Mexico.
Prior to jury selection, the parties were requested to brief the choice-of-law questions presented as to both liability and damages in this case. All parties have agreed that, as to liability, the law of Mexico must be applied. There is, however, sharp dispute as to whether the law of New York or the law of Mexico should control as to damages.
Applicable Mexican law (contained in the Civil Code of Guerrero State, and identical to that of the Federal District of Mexico, designated as arts 1910, 1912, 1915, 1916, 1918, and the Mexican Federal Labor Law arts 500, 501, 502, 503) provides for limitations on damages for disability and for pain and suffering (denominated "moral damages” under Mexican law) which in this case would limit the plaintiff to recovery in the amount of $5,256. Under New York law there is no limitation on recovery either for permanent disability or for pain and suffering. Defendants argue that the law of the place of the tort controls the issue of damages, citing several New York cases. Plaintiff argues that a limitation of the amount which would be imposed in this case is contrary to New York’s *880 policy of justly compensating its residents for injury, and cites Federal cases applying New York law for that proposition.
Based on the papers submitted by both sides on this in limine motion, and for all the reasons discussed below, I find that the law of Mexico must apply to the issue of damages in this case. Because the New York case law language which supports defendants’ position does not occur in cases involving tort damages, and because the whole question of the applicable rules in New York choice-of-law cases is somewhat in flux, separate analysis will be made of the cited New York decisions, the trends in New York choice-of-law doctrine since Babcock (supra), Federal decisions from the Southern District and the Second Circuit concerning damages in tort cases, and the result of almost 25 years of judicial and scholarly controversy as to choice-of-law questions. The result of this analysis compels the principled and consistent application of a set of clearly defined rules which have been proposed by our highest court during this period of confusion, experimentation, and creativity.
NEW YORK CASES
The Court of Appeals has decided several post -Babcock cases in which a choice-of-law question as to compensatory damages was raised in a nontort setting. Leading among these is James v Powell (19 NY2d 249 [1967]) which involved the alleged fraudulent conveyance of property in Puerto Rico for purposes of frustrating enforcement of a judgment. In broad strokes the court wrote "[I]t is clear that the measure of compensatory damages is determined by the same law under which the cause of action arises (see Long v. Pan Amer. World Airways, 16 N Y 2d 337, 343; Davenport v. Webb, 11 N Y 2d 392) * * * An award of compensatory damages depends upon the existence of wrongdoing — in this case, an issue for resolution under the lex situs of the property alleged to have been fraudulently conveyed.”[1] (Supra, at 259.)
*881 In Hacohen v Bolliger Ltd. (108 AD2d 357 [1st Dept 1985]), the First Department also applied the law of the State whose law gave rise to liability to determine the measure of damages. In that case, involving warehouse bills of lading and the liability of a bailee for loss of property, the court first found that the law of Connecticut applied to the issue of liability. After granting partial summary judgment to the plaintiff based on its reading of Connecticut law, it proceeded, without discussion, to hold that the Connecticut law of damages would also apply.[2]
Both of these cases, holding that the law by which liability is determined also governs damages, would appear to strongly support the finding that Mexican law as to damages governs in the instant action. However, since the cases do not involve tortious accidents, since there is language in other New York cases which could be read to indicate that New York has a strong policy in insuring complete recovery for its residents, and because there are Federal cases to the contrary, a review of the development of choice of law over the past 25 years, with particular emphasis on New York, must be undertaken so as to ground more firmly the choice of law reached here.
THE DEVELOPMENT OF MODERN CHOICE-OF-LAW JURISPRUDENCE
Traditional conflict-of-law theory in the United States reflected the tension between the doctrine of comity, associated particularly with the writings of Justice Story (see, e.g., Story, Conflict of Laws, Foreign and Domestic §§ 33, 36, 38 [4th ed 1852]), and the notion of "vested rights” developed in large part by Joseph Beale during the early 1900’s.[3] Under these theories, the rule of lex loci — the law of the place where the act in question occurred — was controlling. With massive industrialization, and rapid advances in transportation and communication, the transactions or activities in which people *882 engaged began frequently to transcend State and even national borders. Under these circumstances, more than one sovereignty might well have an interest in a dispute, and indeed the location of the occurrence giving rise to liability might be little more than fortuitous.
A public policy exception arose in order to ameliorate arbitrary or inappropriate results under the vested rights or comity theories. Under this exception, a foreign State might refuse to apply the foreign law of lex loci delicti where application of that foreign law would injure its own citizens. (See, e.g., Hilton v Guyot, 159 US 113, 164 [1895].) The public policy exception, however, lacked a clear analytical base, and was subject to criticism by the commentators who struggled to find a new basis which would more adequately reflect both the realities of modern life and the increasing importance of the domicile of the parties.
With the demise of the underpinnings for the vested rights and comity theories of choice of law, a bewildering number of new theories, each with its own academic sponsor, arose. Among these were the "governmental interest analysis” first advanced by Professor Brainerd Currie in the late 1950’s, the "in most significant relationship” theory of the Second Restatement, propounded primarily by Professor Willis L. M. Reese, and the "choice-influencing considerations” theory propounded primarily by Professor Robert A. Leflar.[4]
Professor Hill has described the impact of these various theories on the judicial decision-making process as follows: "what has emerged on the judicial plain is chaos. Different courts have had their favorite scholars, with occasional shifting of allegiances, notwithstanding inconsistent views propounded in these writings * * * [W]hat the judges have undertaken, on pain of academic derision if they flinch, is a task comparable to the reinvention of the wheel, only more complicated” (Hill, The Judicial Function in Choice-of-Law, 85 Colum L Rev 1585, 1600 [1985]).
New York was the first State to clearly reject the rigid lex loci delicti rules, initially adopting a "center of gravity” or *883 "grouping of contacts” theory of conflicts in contracts actions (Auten v Auten, 308 NY 155, 160 [1954]) and then in torts (Babcock v Jackson, supra). A series of subsequent Court of Appeals decisions, all involving choice-of-law questions in guest-statute cases, demonstrated disagreement over the meaning of the Babcock approach.[5] In these, and other choice-of-law cases decided at around the same time, it appeared that the test applied by the New York court, especially under the leadership of Judge Keating, had shifted to Professor Currie’s governmental interest analysis.
In Neumeier v Kuehner (31 NY2d 121) Chief Judge Fuld, who had dissented in Dym v Gordon (16 NY2d 120, 129) and concurred in Tooker v Lopez (24 NY2d 569, 583), noted the difficulties which had arisen from the court’s somewhat meandering post -Babcock path. He described the Babcock court’s "sacrifice [of] the certainty provided by the old rule for the more just, fair, and practical result that may best be achieved by giving controlling effect to the law of the jurisdiction which has the greatest concern with, or interest in, the specific issue raised in litigation.” (Supra, 31 NY2d, at 127.) He acknowledged that the court’s subsequent decisions had "lacked consistency” and proposed, as he had in his concurrence in Tooker, a set of rules which would lead to greater consistency and predictability. (Supra, at 127.) He wrote: "The single all-encompassing rule which called, inexorably, for selection of the law of the place of injury was discarded, and wisely, because it was too broad to prove satisfactory in application. There is, however, no reason why choice-of-law rules, more narrow than those previously devised, should not be successfully developed, in order to assure a greater degree of predictability and uniformity, on the basis of our present knowledge and experience.” (Neumeier v Kuehner, supra, at 127.) Chief Judge Fuld proposed the formulation of " 'a few rules of general applicability, promising a fair level of predictability’ ” which incorporated and codified the governmental interest analysis already developed and applied in the court’s prior decisions. (Supra, at 128.)
Briefly, those rules, commonly denominated "the Neumeier rules”, are as follows:
(1) In "false conflict” cases, where the guest-passenger and *884 host-driver have the same domicile, and the car in question is registered in the same State, the law of that State should control.
(2) In the so-called "true conflict” or "split-domicile” cases, where the defendant driver’s domicile and the place of the accident are the same, the law of the place of accident should be applied, but where the plaintiff’s domicile and the place of injury are the same the law of the plaintiff’s domicile should apply.
(3) In those situations where the passenger plaintiff and the defendant driver have different domiciles, the normally applicable rule of decision would be that of the State where the accident occurred "but not if it can be shown that displacing that normally applicable rule will advance the relevant substantive law purposes without impairing the smooth working of the multistate system or producing great uncertainty for litigants” (supra, at 128).
Neumeier (supra) was the last of the Court of Appeals decisions on guest-statute choice-of-law questions, and virtually the last decision discussing the broad general principles applicable in conflict cases. Although the Neumeier rules were directed only at resolving guest-statute choice-of-law problems, their adoption signaled a return to the law of lex loci delicti in tort cases involving split domiciles.[6] The commentators were predictably divided in their views of the Neumeier decision, with Professor Hill, inter alia, praising the Fuld approach, writing "the rule of lex loci delicti goes far to advance sensible policies of fairness and accommodation in a community of states. It is unnecessary and wasteful to uproot lex loci delicti in its entirety, in order to deal with the excesses resulting from uncritical application of the rule to all the collateral issues arising in tort litigation.” (Hill, op. cit., at 1625.)
Thirteen years later, a newly constituted Court of Appeals reaffirmed the Neumeier rules and extended their applicability beyond guest-statute situations into the broader area of loss-allocation in tort law. (Schultz v Boy Scouts, 65 NY2d 189 [1985].) In the long silence between Neumeier (supra) and *885 Schultz,[7] confusion reigned in both the Federal and lower State .courts.[8] Before discussing Schultz and its relevance to the instant case, the "detour” taken by the Second Circuit must be briefly examined.
THE FEDERAL CASES
Shortly after Neumeier (supra), the Second Circuit decided the first of two true-conflict tort cases, purporting to apply New York conflicts law. In Rosenthal v Warren (475 F2d 438 [2d Cir], cert denied 414 US 856 [1973]) the court, in a 2-to-l opinion, refused to apply Massachusetts’ wrongful death recovery limitation[9] to a New York domiciled plaintiff, suing in New York, for the death of her husband which had occurred in a Massachusetts hospital. In O’Connor v Lee-Hy Paving Corp. (579 F2d 194 [2d Cir], cert denied 439 US 1034 [1978]), citing Rosenthal, the court applied the New York Workmen’s Compensation Law (which permitted a cause of action for damages) rather than a Virginia limitation to recovery of benefits under its workmen’s compensation statute, where a New York plaintiff sued in New York for damages caused in Virginia by a Virginia domiciliary. Also following Rosenthal, a Southern District decision applied the law of the New York plaintiff’s domicile to the issue of damages rather than the law of the place of the accident and the defendant’s domicile. (Gordon v Eastern Air Lines, 391 F Supp 31 [SD NY 1975].)
These Federal decisions are, of course, not binding on this *886 court. Although they are analogous in their presentation of a true split-domicile situation, their reasoning is unpersuasive, their discussion of applicable New York law, especially in light of the subsequent decision in Schultz (supra), is incorrect, and their complete failure to consider, much less apply the Neumeier rules, leaves them fatally flawed.
Criticizing the Federal cases in an article written before the extension of the Neumeier rules in Schultz (supra), Professor Korn presciently wrote "If the federal court had given any thought to the Neumeier rules, it might have recognized that they imply certain larger messages. These messages are of transcendent importance to a sound transition of the modern approaches from the simple Babcock situation to the more problematical split-domicile conflict patterns: that the dispositive force of Babcock’s insight into the importance of the domicile contact would prove much diminished in the context of split-domicile conflicts; that the latter would require reconsideration of the necessity for resort to the much maligned locus contact; and that this in turn might often require New York plaintiffs and recovery laws to yield to the contrary laws of other states.” (Korn, The Choice-of-Law Revolution: A Critique, 83 Colum L Rev 772, 917.) The "certain larger messages” were spelled out in Schultz (supra), which must be considered next.

SCHULTZ v BOY SCOUTS

Schultz (supra) involved a "reverse” Babcock situation— which the court characterized as one where New York was the place of the tort (the "forum-locus” State) rather than the jurisdiction of the parties’ common domicile (Schultz v Boy Scouts, supra, at 199). The question presented was whether New York would apply New Jersey’s charitable immunity doctrine to bar recovery in a suit between New Jersey domiciliarles for injuries sustained, at least in part, in New York.
The court reviewed its history of guest-statute cases beginning with Babcock (supra) and ending with Neumeier (31 NY2d 121, supra), and reiterated why common domicile requires departure from the laws of lex loci delicti. The court also noted that its decisions in those cases, culminating in Neumeier, were equally applicable to other tort issues, writing "Nor is there any logical basis for distinguishing guest statutes from other loss-distributing rules because they all share *887 the characteristic of being postevent remedial rules designed to allocate the burden of losses resulting from tortious conduct”. (Supra, 65 NY2d, at 199.)
As to the New Jersey defendant, the court found the first "common domicile” Neumeier rule applicable (supra, at 200), and went on to explain why it was equally appropriate in this reverse Babcock situation.[10] Among the arguments it amassed in favor of the first Neumeier common domicile rule were reduction of opportunities for forum shopping, and rebuttal of "charges that the forum-locus is biased in favor of its own laws and in favor of rules permitting recovery ” (supra, at 201; emphasis added). Finally and significantly the court reiterated Judge Fuld’s concerns, finding that application of the common domicile rule "produces a rule that is easy to apply and brings a modicum of predictability and certainty to an area of the law needing both.” (Supra, at 201.)
In addition to the primary defendant who was domiciled in New Jersey, an additional defendant was domiciled in Ohio, a third jurisdiction (differing, that is, from both plaintiff’s domicile and the forum-locus State), also with a charitable immunity statute. Here the court explicitly applied the third Neumeier rule, displacing the rule of the place of the tort because of its finding that the New Jersey rule would " ' "advance” the relevant substantive law purposes without impairing the smooth working of the multi-state system or producing great uncertainty for litigants.’ ”[11] (Supra, at 201.)
The Schultz opinion (supra) clearly reaffirmed the validity and applicability of the Neumeier rules and expanded their coverage to all postevent tort loss-distribution questions. In addition, in its careful analysis of the reasons for such rules, the court expressed a clear distaste for bias in favor of the *888 forum’s law,[12] or in favor of a rule solely because it granted or increased recovery. In a second portion of the opinion, having decided the relevant choice-of-law questions, it went on to consider the amorphous public policy exception.
PUBLIC POLICY
Plaintiffs in Schultz (65 NY2d 189, supra), as here, argued as a last resort that, having chosen New Jersey loss-distribution law under the Neumeier choice-of-law rules, New York should nevertheless refuse to apply that law as contrary to its public policy. The court reviewed the purposes and requirements of the so-called public policy exception, noting "The party seeking to invoke the doctrine has the burden of proving that the foreign law is contrary to New York public policy. It is a heavy burden for public policy is not measured by individual notions of expediency and fairness or by a showing that the foreign law is unreasonable or unwise * * * Public policy is found in the State’s Constitution, statutes and judicial decisions and the proponent of the exception must establish that to enforce the foreign law 'would violate some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal’ expressed in them” (supra, 65 NY2d, at 202).
To prevail, the court continued, the party must also establish "that there are enough important contacts between the parties, the occurrence and the New York forum to implicate our public policy and thus preclude enforcement of the foreign law”[13] (supra, at 202, citing Paulsen & Sovern, "Public Policy” in the Conflict of Laws, 56 Colum L Rev 969, 981 [1956]).[14] It *889 reviewed prior public policy cases, including Miller v Miller (22 NY2d 12) and concluded that as there were insufficient contacts present it need not decide whether public policy was so implicated[15] as to require application of the doctrine. (Supra, at 203.) The precise status of the public policy exception in New York thus remains unclear.
THE CALL FOR GENERALIZED RULES AND PREDICTABILITY
Before considering the effect of all the previously discussed case law on the instant question, it may be useful to consider the present state of the "choice-of-law revolution” and the increasingly heard call for more uniform rules and greater predictability.
A survey of the field shows what can charitably be described as chaos. There continues to be enormous scholarly disagreement over virtually everything except rejection of the old vested rights approach,[16] and the States are wildly split in the theories they purport to follow[17] and the consistency with which they apply their chosen theories. Insofar as they reject *890 codification, the "new approaches” produce inconsistent results,[18] make decisions dependent, at least in part, on the forum selected, and thus lead to increased forum shopping and even more litigation of choice-of-law issues.
There is an increasing call for a return to rules which eliminate the absurd results of pre-Babcock common domicile cases, incorporate general notions of State interest, and provide uniformity and predictability regardless of the forum chosen. This latter point is also important as a general matter of fairness to the parties; the result in a case should not, as a principled matter, depend on who gets to which courthouse first.
In the various formulations which more uniform choice-of-law rules might take, it is important to note the homage paid not only to the original Babcock decision (supra), but to our Court of Appeals singularly "valiant attempt at laying down rules of choice of law in tort,” (Reese, Substantive Policies and Choice of Law, 2 Touro L Rev 1, 3 [1986]; see also, Korn, op. cit., at 827; Hill, op. cit., at 1623-1625), that is, the Neumeier rules. Those rules, although an admittedly early attempt at making sense of chaos, may well, in the light of 15 years of further litigation, provide the best guide to a fair, reasonable, consistent and constitutional determination of choice of law in tort cases.
Other "rules” suggested by those who call for predictability and fairness may differ somewhat in their specifics, but generally reflect the principles upon which the Neumeier rules are premised. Professor Korn would have the common domicile of the parties as the preeminent choice-of-law rule, with lex loci delicti normally applicable in split-domicile situations, subject to certain specified exceptions which could require application of the law of a State with substantially greater connection to the parties or transaction involved. (Korn, op. cit., at 799, 966- *891 967.) Professor Reese would generally apply locus law to liability and to damages (assuming the conduct and injury occurred in the same place) unless, in the case of damages, the parties share a different common domicile and recovery would be greater under that State’s law. (Reese, op. cit., at 8-11.) Neither of these thoughtful formulations is inconsistent with the Neumeier rules; all three would compel the application of lex loci delicti in the instant case.
THE DECISIONS, RULES AND THE QUESTIONS OF DAMAGES
As can now be seen, both the specific language of the nontort choice-of-law decision in James v Powell (19 NY2d 249, supra) and Hacohen v Bolliger Ltd. (108 AD2d 357, supra) and the application of the still viable and clearly applicable Neumeier rules require that the Mexican law of damages apply to this Mexican accident, allegedly caused by a Mexican domiciliary. Since the second Neumeier rule, here controlling, has never been discussed in the fact pattern of an actual case, it may be instructive, following the Schultz format, to briefly examine its allocation of governmental interests in this situation.
New York’s interests in applying its law of unlimited damages are to maximize recovery for its domiciliaries, ensure that medical creditors in the State will be paid, and avoid the possibility that its injured domiciliaries will become public charges. As in Schultz (supra), there is no evidence which would implicate the latter two "interests” in this case; the first reason has been specifically eschewed in opinions of the Court of Appeals (e.g., Schultz v Boy Scouts, supra, at 200; Macey v Rozbicki, 18 NY2d 289, 295 [Keating, J., concurring]; see, Hill, The Judicial Function in Choice of Law, 85 Colum L Rev 1585, 1606-1607, n 111).
The second and third interests also seem undercut, particularly in the case of deliberate foreign travel/vacationing, by the widespread availability of traveler’s insurance, as well as the medical insurance a majority of New Yorkers obtain through their employment or the employment of family members. Although the expectations of parties are not, per se, considered in New York choice-of-law interest analysis, the ability of the parties to anticipate and protect against injury or disability occurring during foreign travel further lessens both of the State’s alleged fiscal interests.
Mexico’s interests are more direct and unambiguous. As defendant argues, Mexico has a strong substantive interest in *892 encouraging the development of a tourist industry.[19] This includes protecting the reasonable and justifiable expectations of commercial and resort entities within its borders from the severe uncertainty of financial liability arising out of suits in the United States and other foreign jurisdictions.[20]
Further, because of its history of domination by colonial powers and the continuing threat of domination of its economy by foreign and multinational capital, Mexico has insisted upon its sovereignty as against claims by foreign nations and foreign nationals. Since adoption of the 1917 Constitution (Mexico Const art 27 [1917]), foreign ownership of land without governmental approval has been illegal. The Constitution also provides "The Nation shall at all times have the right to impose on private property such limitations as the public interest may demand * * * in order to conserve them and to ensure a more equitable distribution of public wealth” (id., quoted in Gordon, The Joint Venture As An Institution for Mexican Development: A Legislative History, 1978 Ariz St LJ 173, 179 [1978]). This provision reflects Mexico’s strong concerns in preventing foreigners from depleting the country’s capital and resources. (Wright, Foreign Enterprise in Mexico: Laws and Policies, at 101-102 [1971].) To permit a New York resident vacationing in Mexico to recover hundreds or even thousands of times what a Mexican national, injured in the same accident, would receive under Mexican law[21] would be the most serious possible violation of Mexico’s interest and sovereignty in this situation.
In addition, both jurisdictions have an interest in fairness *893 and equality of treatment[22] which is further reflected and incorporated in their interest in discouraging forum shopping. If lex loci delecti does not apply when the defendant is domiciled in the same jurisdiction where the wrong occurred, and the plaintiff went there purposely and voluntarily,[23] plaintiffs will be encouraged to seek out forums where, as with New York’s legendary jury awards, they can expect the largest possible recovery.[24]
Consideration and balancing of these interests demonstrate the wisdom and continued efficacy of the Neumeier rules and, in particular, compel the conclusion that the application of Mexican damages law, mandated by application of the second rule, is entirely appropriate in this case.[25] All that remains, therefore, is determination of whether a public policy exception, left open in Schultz (supra), bars its application in this case.
THE PUBLIC POLICY EXCEPTION REVISITED
Despite the repeated use of language concerning New York’s alleged public policy "to 'protect’ its own residents whenever possible 'against’ the 'unfairness’ * * * of 'anachronistic’ foreign laws and from the denial of recovery under such laws” (e.g., Gordon v Eastern Air Lines, 391 F Supp 31, 34, supra), the post-Babcock New York Court of Appeals has never displaced a foreign or sister-State limitation on recovery which would have/otherwise been applicable under the Neumeier rules. Kilberg v Northeast Airlines (9 NY2d 34, supra) *894 decided prior to Babcock v Jackson (12 NY2d 473, supra)[26] and Miller v Miller (22 NY2d 12, supra) was not a true conflicts case.[27] The Federal cases previously discussed are not binding and appear to be decided incorrectly for several reasons.[28]
Although Schultz v Boy Scouts (65 NY2d 189, supra) suggests the continued viability of the public policy exception, that exception to otherwise binding choices of law should be narrowly limited to avoid affronts to comity and the "smooth functioning of the international[29] and multi-state order.” The courts of our State have recognized, if sometimes only implicitly, that the necessity for the public policy exception has virtually disappeared with the institution of the governmental interest analysis partially codified in the Neumeier rules. Despite language which might locate public policy in statutes or judicial decisions, only foreign statutes directly violating our supreme law, the State Constitution, have been rejected under the public policy exception[30] since the Babcock decision *895 (supra). As Judge Cardozo observed of the public policy exception long before the development of governmental interest analysis which determines choice of law in New York today, "Our own scheme of legislation may be different * * * That is not enough to show that public policy forbids us to enforce the foreign right * * * We are not so provincial as to say that every solution of a problem is wrong because we deal with it otherwise at home” (Loucks v Standard Oil Co., 224 NY 99, 110-111 [1918]).
CONCLUSION
The Mexican limitation of damages may be distasteful to many and is surely disadvantageous to the plaintiffs in this case. Nevertheless it violates no New York constitutional provision, while its application furthers Mexico’s most basic constitutional principles. Application of the law of the place of injury and the defendant’s domicile best balances governmental interests and, to the extent foreseeable, fulfills the reasonable expectations of the individual parties involved.
The Neumeier rules, of which this is the second, provide predictability, equality of treatment, and ease of application. In the leading tradition of the New York courts they represent the best effort to date to develop a fair and workable system of choice of law. As Schultz (supra) held, they should be generally applied in tort loss distribution cases, subject only to the limited public policy exception described above and not here implicated. The Neumeier rules and the cases previously cited require the application of the Mexican law of damages in this case.

. The issue in the case was the applicability of the various laws of punitive damages and the court wrote, as to this issue "[a]n award of punitive damages, on the other hand, depends upon the object or purpose of the wrongdoing and on this issue we should look to the 'law of the jurisdiction with the strongest interest in the resolution of the particular issue presented’. (Babcock v Jackson” (James v Powell, 19 NY2d 249, 259 [emphasis in original]). Accordingly, New York law, rather than Puerto Rican law, the law of the situs of the property, was held to govern the issue of punitive damages.

. Since the parties had assumed that New York law would apply, the issue of Connecticut damages law was not briefed. Thus the court wrote "As to the damages to which plaintiff would be entitled under Connecticut law, we have concluded that it would be inappropriate to decide that issue on this appeal as a matter of law in the somewhat unusual procedural setting that is presented.” (Hacohen v Bolliger Ltd., 108 AD2d 357, 361; emphasis added.)

. See, e.g., Note, Choice of Law: A Fond Farewell to Comity and Public Policy, 74 Calif L Rev 1447, 1448-1449 (1986); Beale’s vested rights theory was codified in the first Restatement (Restatement of Conflict of Laws [1934]).

. For a thorough discussion of each of these theories, citations to the articles and treatises in which they are propounded, and a State-by-State breakdown of the jurisdictions which have adopted each of them and others see Kay, Theory into Practice: Choice of Law in the Courts (34 Mercer L Rev 521 [1983]). The first major judicial break with the old theories came however, not as a result of academic theories, but of the New York Court Appeals decision in Babcock v Jackson (12 NY2d 473).

. These were, in chronological order, Dym v Gordon (16 NY2d 120 [1965]), Macey v Rozbicki (18 NY2d 289 [1966]), Tooker v Lopez (24 NY2d 569 [1969]) and Neumeier v Kuehner (31 NY2d 121 [1972]).

. For an extensive discussion of the debates leading up to the Neumeier v Kuehner (31 NY2d 121) decision, and the varying arguments and positions resolved in the opinion and its subsequent application, see Korn, The Choice-of-Law Revolution: A Critique, (83 Colum L Rev 772, 827-903 [1983]).

. There were two actually reported choice-of-laws decisions between Neumeier v Kuehner (31 NY2d 121) and Schultz v Boy Scouts (65 NY2d 129), Towley v King Arthur Rings (40 NY2d 129 [1976]) and Cousins v Instrument Flyers (44 NY2d 698 [1978]) but both treated the issue summarily.

. In Himes v Stalker (99 Misc 2d 610 [Sup Ct, Cattaraugus County 1979]) for example, the court expressed uncertainty as to whether the Neumeier rules applied to tort conflicts other than those involving guest statutes, and concluded that they did not. (Supra, at 618.)

. As to this part of the case, Judge Oakes relied on the pre-Babcock decision in Kilberg v Northeast Airlines (9 NY2d 34 [1961]) and the postBabcock wrongful death damage cases Long v Pan Am. World Airways (16 NY2d 337 [1965]) and Miller v Miller (22 NY2d 12 [1968]). Those cases are distinguishable from other kinds of limitations on damages because of the special public policy exception they further, based not on case law or legislation, but on the prohibition on wrongful death recoveries enshrined in our Constitution (see, discussion infra). Commentators have pointed out other distinguishing features, including a postevent change of domicile in Miller which altered the position in that case from one of true to one of false conflict. (See, e.g., Korn, The Choice-of-Law Revolution: A Critique, 83 Colum L Rev 772, 905 [1983].)

. The court noted that because "this case presents the first case for our review in which New York is the forum-locus rather than the parties’ common domicile * * * we consider the reasons most often advanced for applying the law of the forum-locus and those supporting application of the law of common domicile.” (Schultz v Boy Scouts, 65 NY2d 189, 200.) The arguments for forum-locus law were summarized, found inapplicable in the absence of record evidence, and finally criticized as being "biased in favor of recovery.” (Supra, at 200.)

. Interestingly, although the court, as its predecessor had, generally eschewed the "parties’ reasonable expectations of the applicable law” as a consideration, it included discussion of that expectation in connection with the " 'uncertainty’ ” standard of the third Neumeier rule. (Schultz v Boy Scouts, 65 NY2d 189, 201-203, n 3.)

. In this respect New York, although employing the language of governmental interest analysis, has distanced itself from Professor Currie’s view that the forum should apply its own law in any true conflicts case. (See, Kay, Theory into Practice: Choice of Law in the Courts, 34 Mercer L Rev 521, 549.) Even California, the leading State in adopting the Currie approach, has rejected this absolute proforum bias. (See, e.g., Offshore Rental Co. v Continental Oil Co., 22 Cal 3d 157, 164-165, 583 P2d 721, 722-724 [1978].)

. This second requirement may be constitutionally compelled by the Full Faith and Credit Clause (see, e.g., Allstate Ins. Co. v Hague, 449 US 302, 313 [1981]; Schultz v Boy Scouts, 65 NY2d 189, 202-203, n 4).

. The Paulsen and Sovern article was written pre-Babcock when a public policy exception was needed to escape "absurd results” where rigid rules were otherwise applied. (See, e.g. Currie, Selected Essays on the Conflict of Laws, at 288 [1963].) Even at the time, the exception was subject to criticism as a substitute for the intellectual rigor necessary to find *889 appropriate factors. (Paulsen & Sovern, "Public Policy” in the Conflict of Laws, 56 Colum L Rev 969, 987-988, 1016.) The development of modem choice-of-law rules, focusing, in different formulas, on the significance of contacts and the interest of States measured by the policies of their laws, has significantly changed the legal field upon which the public policy exception was played out. As such, many commentators argue that the doctrine has, in addition to all the other criticisms leveled against it (see, discussion infra), been rendered unnecessary and obsolete. (E.g., Note, Choice-of-Law: A Fond Farewell to Comity and Public Policy, 74 Calif L Rev 1447.)

. In Miller v Miller (22 NY2d 12), as in Kilberg v Northeast Airlines (9 NY2d 34), the prohibition of limitation on wrongful death recovery was found in the State’s highest law, its Constitution. By contrast, the doctrine of charitable immunity was judicially repudiated (see, Bing v Thunig, 2 NY2d 656, 667 [1957]).

. Professor Kay observes that "it is futile to expect the court to develop, or even to follow consistently, a coherent choice of law theory when so much scholarly disagreement exists over fundamental questions” (Kay, Theory into Practice: Choice of Law in the Courts, 34 Mercer L Rev 521, 586). She cites the Hawaii Supreme Court as complaining that "a verdict on a generally acceptable 'approach’ to replace the unsatisfactory 'rule’ is not yet to be returned by the scholarly jury” (Peters v Peters, 63 Haw 653, 661, 634 P2d 586, 592 [1981]).

. In her 1983 survey of the approaches employed by the various States, Kay found as follows: "The scorecard is twenty-one states and the District of Columbia adhering to the traditional approach: sixteen expressly; three having abandoned it only in part; one, the District of Columbia, apparently having returned to it; and two having no cases on point in the last thirty years; compared to twenty-nine states that have rejected the traditional *890 approach in favor of various modern theories. The latter include 'center of gravity,’ two; governmental interest analysis, two; the Restatement Second, fourteen, including Vermont; Leflar’s choice-influencing consideration, three; lex fori, two; and a combination of the above, six.” (Kay, Theory into Practice: Choice of Law in the Courts, 34 Mercer L Rev 521, 586, n 399; 591-592 [Appendix].)

. See, e.g., Scoles and Hay, Conflict of Law § 2.16 (impossibility of determining policies and interests of relevant leads to unpredictable, ad hoc results); Rosenberg, The Comeback of Choice-of-Law Rules, 81 Colum L Rev 946 (1981) (criticizing governmental interest analysis as necessitating subjective, therefore dangerous, value judgments at the expenses of simplicity, predictability and multistatement harmony).

. Mexico’s interest in fostering a tourist industry has been considered important and legitimate in choice-of-law analysis by California courts (e.g., Hernandez v Burger, 102 Cal App 3d 795, 162 Cal Rptr 564, 563 [Ct App, 4th Dist 1980]).

. As defendants state, they and other Mexican resorts rely on the validity and applicability of their own Mexican damage status in business, financial and commercial planning. To expect a resort entity in Mexico to research and subsequently incorporate the laws of damages of endless jurisdiction into their financial planning would severely tax such business, seriously impairing vital Mexican interest in protecting the essential tourist industry.

. Mexico also has an interest in equal treatment of foreigners and its own citizens. With a few exceptions (most notably the right to work) Mexico affords foreigners the same constitutional protection — including access to its judicial system — which its citizens enjoy. (See, Lacey, Protection of Foreigners’ Rights in Mexico, 13 Intl Law 83 [1979].)

. Interests shared by all jurisdictions are included in the Restatement’s enumeration of general "Choice-of-Law Principles” which include "the needs of the interstate and international systems”, "certainty, predictability and uniformity of result” and "ease in the determination and application of the law to be applied” (Restatement [Second] of Conflict of Laws § 6 [1971]).

. This distinguishes the situation generally found in plane crash cases, where the place of the accident is entirely fortuitous.

. In support of his formulated choice-of-law rule for damages Professor Reese writes "the fact that the plaintiff is domiciled in a state whose law provides for a grater measure of recovery should not affect a defendant who has acted and caused injury at home.” (Reese, Substantive Policies and Choice of Law, 2 Touro L Rev 1, 9.)

. The fact that it is unfavorable to the Feldmans is unfortunate, but arises from application of a neutral rule in which their injuries are compensated at precisely the same rate as if they were Mexican domiciliaries, or domiciliaries of any other State or jurisdiction. (See generally, the discussion of "conflicts justice” in Korn, The Choice-of-Law Revolution: A Critique, 83 Colum L Rev 772, 959-960.)

. Korn writes "The Babcock opinion’s treatment of Kilberg may fairly be read as vindicating the earlier decision’s resort to this corrective choice-of-law function of the traditional 'public policy’ exception to avoid an application of the lex loci delicti rule that Babcock would soon have shown to be unsound, without at the same time approving either the 'bombastic localism’ of the Kilber opinion or its substantive condemnation of the Massachusetts law as 'absurd and unjust.’ ” (Korn, The Choice-of-Law Revolution: A Critique, 83 Colum L Rev 772, 914.)

. Not only had the Miller v Miller (22 NY2d 12) defendants moved from Maine to New York following the Maine accident which took the plaintiff's life, Maine had repealed its limitation on wrongful death recovery, thus completely eliminating any conflict.

. In addition to the reasons already discussed, both were decided prior to the Schultz v Boy Scouts decision (66 NY2d 189) which was the first Court of Appeals clarification of the applicability of the Neumeier rules to non-guest statute cases.

. The danger of narrow parochialism is especially great where the laws, sometimes distasteful, of foreign governments are involved. Yet it is precisely these cases where consideration of the mutual respect necessary among the community of nations should most limit the public policy exception. (See generally, Note, Transnational Public Policy as a Factor in Choice-of-Law Analysis, 5 NYL Sch J Inti and Comp L 367 [1984].)

. The Second Department has, however, twice refused to apply immunity defenses applicable under the foreign lex loci delicti laws. (Scharfman v National Jewish Hosp. & Research Center, 122 AD2d 939 [2d Dept 1986]; Rakaric v Croatian Cultural Club, 76 AD2d 619 [2d Dept 1980].) The latter case was one of common domicile, so there was no real choice-of-law question; the former incorporated New York’s interest in " 'protecting its own residents injured in a foreign State against unfair or anachronistic statutes of that State’ ” (supra, at 940, citing Schultz v Boy Scouts, 65 NY2d 189), into its choice of New York common law as the applicable law without reference either to the Neumeier rules or to the public policy exception.